PAUL A. BONIN, Judge.
| Recording to Baraki Tsegaye, a taxi cab driver, a light pole fell on him while he was waiting for a fare outside the W Hotel on Poydras Street in New Orleans. He was injured and sued Royal Engineers & Consultants, L.L.C., among others. Royal Engineers had contractually undertaken certain obligations respecting this and other light poles owned by the City of New Orleans. Arguing that it had no notice of a defect in the particular light pole, Royal Engineers filed a motion for summary judgment, which if successful would result in its dismissal with prejudice from the lawsuit. Although the trial judge granted the partial summary judgment, the judgment did not contain any decretal language.
At the time of moving to appeal the judgment, Mr. Tsegaye obtained a “certification” by the trial judge that the summary judgment was “final for the purposes of La. C.C.P. art. 1915.” We, however, without prompting by the parties, issued a rule to show cause why the appeal should not be dismissed because of the absence of decretal language. The parties responded. Because we do not have appellate jurisdiction arising from this summary judgment, we dismiss the appeal, 12but, as we explain later in this opinion, we convert the appeal to an application for supervisory relief and exercise our supervisory jurisdiction to review the granting of the summary judgment.
Following our de novo review of the summary judgment, we find that the trial judge was legally correct in his decision that there were no genuine issues of material fact which precluded summary judgment. We amend the judgment, however, to supply the necessary decretal language, including dismissing with prejudice Mr. Tsegaye’s suit against Royal Engineers.
We explain our decisions in greater detail in the following Parts.
I
We begin by explaining why we cannot exercise our appellate jurisdiction in this matter but are choosing to exercise our supervisory jurisdiction.
A
The Louisiana Constitution of 1974 provides for our appellate jurisdiction and for our supervisory jurisdiction of cases. See La. Const. Art. V, § 10(A). There is a distinction with a difference. As we have observed, the difference is that our appellate jurisdiction is “invocable by the litigant as a matter of right.” Livingston Downs Racing Ass’n Inc. v. Louisiana State Racing Com’n, 96-1215, p. 3 (La.App. 4 Cir. 6/5/96), 675 So.2d 1214, 1216. See also La.C.C.P. art. 2082 (“Appeal is the exercise of the right of a party to have a judgment of the trial court revised, modified, set aside, or reversed by an appellate court.”). But, importantly, our supervisory jurisdiction is “discretionary on the part of the appellate court....” Livingston Downs Racing Ass’n, Inc., 96-1215, p. 3, 675 So.2d at 1216. See also La. C.C.P. art. 2201 (“Supervisory writs may be applied for and granted in accordance with the constitution and rules of the su *710 preme court and other courts exercising appellate jurisdiction.”).
We cannot, however, determine the merits of an appeal unless our jurisdiction is properly invoked by a valid final judgment. See Board, of Supervisors of La. State Univ. and Agric. And Mech. Coll. v. Mid City Holdings, L.L.C., 14-0506, p. 2 (La.App. 4 Cir. 10/15/14), 151 So.3d 908, 910; Delta Staff Leasing, LLC v. South Coast Solar, LLC, 14-1328, p. 1 (La.App. 4 Cir. 9/23/15), 176 So.3d 668.
For a judgment to .be “a valid final judgment,” it must contain “decretal language.” Mid City Holdings, L.L.C., 14-0506, p. 2, 151 So.3d at 910. The absence of necessary decretal language means that the judgment is not final and appealable. Id., 14-0506, p. 3, 151 So.3d at 910. Importantly, for the language of a judgment to be considered “decretal,” it “must name the party in favor of whom the ruling is ordered, the party against whom- the ruling is ordered, and the relief that is granted or denied.”' M (emphasis added). And we must be able to determine from the judgment itself — r-without any reference to an-extrinsic source — the specific relief granted. See id.
Here, the judgment which Mr. Tsegaye wishes to appeal merely provides, in relevant part, that “IT IS ORDERED ADJUDGED AND DECREED that Royal Engineers and Consultants, LLC’s Motion For Summary Judgment was |¿GRANTED..The judgment itself identifies Royal Engineers as the successful party. But neither the identity of the losing party nor the dispositive relief granted is specified in the judgment; they are only determinable from reference to the motion for summary judgment itself. The relief to which Royal Engineers is entitled as a result of the trial judge granting summary judgment in this case would be dismissal with prejudice. See La. C.C.P. arts. 968, 1673, 1844. And it is precisely that relief — dismissal .with prejudice — that must be specified in the judgment in order for the judgment to be considered as a final appealable judgment. See Mid City Holdings, L.L.C., 14-0506, p. 2, 151 So.3d at 910 (“Although the district court, judgment properly maintained the exception of prescription,- it failed to decree the dismissal with prejudice of the plaintiffs claim for additional compensation.”).
We acknowledge that the trial judge “certified as final [the judgment appealed from] for the purposes of La. C.C.P. art. 1915” in the order granting Mr. Tsegaye’s appeal. Mr. Tsegaye, citing to a third circuit decision* argues that this “certification” of finality suffices.[1] This “certification,” however, is insufficient, to render this particular judgment appealable in the absence of the appropriate decretal language. It is true that the summary judgment granted in this matter is a partial summary judgment because its effect would determine the merits only in | ¿part. See La. C.C.P. art. 1841. But it is nonetheless a final judgment. See ibid. And because it is a final although partial judgment, its appealability is' determined by the specific provision of Article 1915 of the Louisiana Code of Civil Procedure which *711 applies to the partial final judgment. See Favrot v. Favrot, 10-0986, pp. 3-4 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, 1103. See also LaDonte A Murphy, Access to Appellate Review: Writs, Appeals, and Interlocutory Judgments, 34 S.U.L.Rev. 27 (2007).
At the same time that the trial judge granted Royal Engineers’s motion for summary judgment, he denied the motion filed by the remaining defendant, the City of New Orleans.[2] Thus, with the proper decretal language, this judgment would dismiss Mr. Tsegaye’s suit as to less than all of the defendants. And such a judgment would not require any “certification” of finality. See La. C.C.P. art. 1915 A(l) (“A final judgment may be rendered and signed by the court, even though it may not grant the successful party or parties all the relief prayed for, or may not adjudicate all of the issues in the case, when the court ... [dismisses the suit as to less than all of the ... defendants.... ”); Fav-rot, 10-0986, p. 3, 68 So.3d at 1103. See also Roger A. Stetter, Louisiana Civil Appellate Procedure, § 3:22 (2015-2016 Ed.).[3] A “certification” or “designation” by the trial court of a partial summary judgment “as a final judgment” for the purpose of an immediate appeal is only required when “one or more but less than all the claims, demands, issues, or | ^theories against a party” is decided. See La. C.C.P. art. 1915 B; Favrot, 10-0986, p. 5, 68 So.3d at 1103-1104. Thus, a certification or designation of finality, as was done here, is of no consequence as this partial summary judgment would have dismissed a party and not a claim against a party.
And, therefore, we find that we do not have appellate jurisdiction to review this judgment because our appellate jurisdiction. has not been properly invoked. ,
B
In appropriate cases, when confronted with the lack of appellate jurisdiction, we have, however, converted the party’s appeal to an application for us to exercise our discretionary supervisory jurisdiction and then granted the application. See, e.g,, Lalla v. Calamar, N.V., 08-0952, p. 6 (La.App. 4 Cir 2/11/09), 5 So.3d 927, 931.
Here we find it appropriate to exercise our supervisory jurisdiction because, as we explain in Part V-A, post, there are no genuine issues of material fact, and our review will terminate the action at least as to ohe of the parties. Cf. Whitney Nat. Bank v. Rockwell, 94-3049, p. 6 (La.10/16/95), 661 So.2d 1325, 1329 n. 3 (“when (1) there is no dispute of material fact, (2) the ruling of the trial court appears incorrect, and (3) a reversal would terminate the litigation as to at least one party, the intermediate court should review the merits of the application for supervisory writs”); cf. also Herlitz Const. Co., Inc. v. Hotel Investors of New Iberia, Inc., 396 So.2d 878 (La.1981) (holding, “judicial efficiency and fundamental fairness to the litigants dictates that the merits of the application for ^supervisory writs should be decided” when the judgment is arguably incorrect, a reversal will terminate the litigation, and there is no factual dispute to be resolved).[4] The primary con *712 sideration of these Herlitz factors, however, is that review and decision by us would terminate the litigation. See Ramirez v. Evonir, LLC, 14-1095, p. 5 (La.App. 4 Cir. 4/9/15), 165 So.3d 260, 263.
Typically, in the context of a motion for summary judgment, we are evaluating an application for supervisory review under the Herlitz factors because a trial court denied summary judgment, and the applicant is arguing that the interlocutory judgment is incorrect. See, e.g., Ludlow v. Crescent City Connection Marine Division, unpub., 14-1359, p. 7 (La.App. 4 Cir. 9/23/15), 2015 WL 5609999 (on remand) (Bonin, J., dissenting), rev’d 15-1808 (La.11/16/15), 184 So.3d 21, 2015 WL 9492258; Hooper v. Brown, 15-0339 (La. App. 4 Cir. 5/22/15), 171 So.3d 995. Here, however, because of the way in which the partial summary judgment has arrived, we need not focus on the “arguably incorrect” Herlitz factor, but rather focus on the termination-of-the-litigation factor, which is, of course, present in this case.
Therefore, under these circumstances, we conclude that judicial efficiency and fundamental fairness dictate that we exercise our supervisory jurisdiction and, ^accordingly, we convert the appeal to an application for supervisory writ and grant the application.
II
We now examine this matter’s procedural history. Claiming damages after a light pole fell on him, Mr. Tsegaye filed suit on June 20, 2011, against the City of New Orleans (the pole’s owner), Royal Engineers (which was contractually tasked by the City with inspecting its poles and issuing work orders for repairs to the poles), and All Star Electric, Inc. (which was contractually tasked by the City with responding to Royal Engineers’s repair orders). Invoking the doctrine of res ipsa loquitur, Mr. Tsegaye’s petition asserts that the City, Royal Engineers, and All Star are liable to him under the provisions of Articles 2217 and 2317.1 of the Louisiana Civil Code, which impose strict liability, under certain circumstances, upon persons for defective things within their custody. See Davis v. Riverside Court Condominium Ass’n Phase II, Inc., 14-0023, pp. 5-6 (La.App. 4 Cir. 11/12/14), 154 So.3d 643, 647. He amended his petition on September 20, 2011, to add as a defendant Utility Construction Services, L.L.C., who, like All Star, had a contract with the City to repair light poles pursuant to Royal Engineers’s repair orders. He also asserted a claim for punitive damages arising from the defendants alleged spoliation/removal of the fallen light pole and pole base at issue before it could be examined in connection with his lawsuit. The defendants subsequently answered Mr. Tsegaye’s petitions.
laThe parties then conducted discovery and engaged in motion practice. Notably, the trial judge granted in part the City’s motion for summary judgment and dismissed with prejudice Mr. Tsegaye’s spoliation claim against the City. The City sought supervisory review of the trial court’s denial of the remainder of its motion, We declined to exercise our supervisory jurisdiction. See Tsegaye v. City of New Orleans, unpub., 13-862 (La.App. 4 Cir. 9/17/13) (Bonin, J., concurring). The trial judge also granted two other motions for summary judgment, dismissing with *713 prejudice all of Mr. Tsegaye’s claims against All Star and Utility. Mr. Tsegaye appealed this ruling, which we affirmed. See Tsegaye, 14-1412 p. 9, 140 So.3d at 208.
' Royal Engineers, subsequently, filed a motion for summary judgment, in which it argued that the trial court should dismiss Mr. Tsegaye’s claims against it because he cannot establish at trial at least one element of his strict liability claim — that Royal Engineers knew or should have known at the time of the accident that the fallen pole was allegedly defective. The City, subsequently, filed a motion in which it explicitly adopted Royal Engineers’s arguments and asked the trial judge to again summarily dismiss Mr. Tsegaye’s claims against it. Mr. Tsegaye filed an opposition memorandum in which he opposed the two motions. The parties argued the merits of the two motions before the trial judge, who, at the close of the hearing, granted Royal Engineers’s motion but denied the City’s. Mr. Tsegaye, subsequently, sought review of the trial judge’s December 15, 2014 judgment.
Jjs111
Here we examine the codal law and jurisprudence governing Mr. Tsegaye’s strict liability claim against Royal Engineers, and the applicable standard of review.
A
Mr, Tsegaye’s petition alleges that Royal Engineers is liable for damages because it was negligent in maintaining the light pole pursuant to Article 2315 of the Louisiana Civil Code, and is liable pursuant to Articles 2317 and 2317.1 for damages caused by the ruin of a thing over which it allegedly had custody.[5] A party is responsible not only for damage resulting from one’s own actions, but also-for damages caused by things within one’s custody. La. C.C. art. 2317-, Where damages are claimed as a result of vices or defects in a thing within one’s custody, then this precept of strict liability is to be understood with , the following modification: “[t]he owner or custodian of a thing is answerable for damage occasioned by its' ruin, vice, or defect, only upon-a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that, he failed to exercise such reasonable care.” La. C.C. art. 2317.1.
We-apply a de novo standard of review in éxamiriing trial court rulings-on summary judgment motions. See Rapalo-Alfaro v. Lee, 15-0209, p. 8 (La.App. 4 Cir. 8/12/15), 173 So.3d 1174, 1179. Appellate courts review summary judgments de novo under the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate: whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law.- Id. A court must grant a motion for summary judgment if the pleadings, deposition's, answers to interrogatories, and admissions, together vidth the affidavits, if any, show that there is ho genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. See La. C.C.P. art. 966 B; Rapalo-Alfaro, 15-0209, p. 8, 173 So.3d at 1179.
On a motion for summary judgment, the burden of proof remains with the movant. *714 See La. C.C.P. art. 966 0(2). However, if the moving party will' not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or • defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at- trial. See La. C.C.P. art. 966 C(2), If the opponent of the motion fails to do so, there is no- genuine issue of material fact and summary judgment should be granted. Id.
I12C
In light of the issues before us, and the nature of summary judgment proceedings, we think it important to next briefly establish the parties’ respective burdens of proof in the event this case were to proceed to trial.. Simply put, before a defendant can be cast in judgment under Article 2317, “the plaintiff must prove that: 1) the thing , which caused damage was in the defendant’s custody and control (garde); 2) the thing had a vice or defect which created an unreasonable risk.of harm; - and 3) the injuries were caused by a defect.” Chaplain v. Dimitri, 14-1081, p. 6 (La.App. 4 Cir. 8/6/15), 174 So.3d 222, 226. Additionally, Article 2317.1 “adds the requirement that the injured plaintiff prove that the owner/custodian knew or, in the exercise of reasonable..care, should have known of the unreasonable risk of harm, and that the damage could have been prevented by the exercise of reasonable care, and that [the owner/custodian] failed to exercise such reasonable care.” Id. (internal quotations omitted).
IV
We turn next to examine the evidence presented to the trial judge in connection with Royal Engineers’s motion, which argued that Mr. Tsegaye cannot prove that it either knew, or should have known, that the light pole at-issue was defective. In support of this argument, Royal Engineers introduced copies of Mr. Tsegaye’s original and amending petitions, a copy of the contract for street light management services between the City and Royal Engineers, a copy of the contract for street light maintenance services between the City and All Star, a copy of All | ^Star’s sub-contract with Utility, and excerpts from several depositions taken in this case.
Notably, the City’s contract with Royal Engineers obligates it “to manage street light operations.” Specifically, the contract obliges Royal Engineers to develop several maintenance tracking systems and tasks it with conducting periodic patrols of the streetlight system. As for its development responsibilities, Royal -Engineers is required'by the contract'to “supply, operate, and maintain a geographical information system (GIS) based work order system” to “track and assign all work to the city designated streetlight repair contractor,” which was All Star and Utility, its sub-contractor. Royal Engineers, additionally, is required to create and maintain geographical information system-based maps of the individual streetlights'and the underground circuits. The contract also obligates Royal Engineers to develop and maintain a web and telephone based system for the public reporting of street light complaints, and tó coordinate all third-party activities “affecting street light repair and operations.”
As for Royal Engineers’s patrolling requirements, the contract obliges Royal Engineers to conduct weekly nighttime inspections of the entire streetlight system in order to ensure “proper nighttime operation.” The patrols are to take place “Sunday through Thursday one hour after sunset to one hour before sunrise.” In *715 connection with these patrols, Royal Engineers was also required to “provide the city with a schedule of weekly patrols and routes used,” and equip its patrol vehicles with a “vehicle location system” so as to aid the City in its audit of the |14routes followed. And Royal Engineers is required by the contract to “submit by 4 pm every day all work orders discovered during the previous night patrol, along with all service requests submitted via phone or website before 3 pm.”
Royal Engineers is also tasked with conducting a yearly .daytime survey of the streetlight system. This survey requires Royal Engineers to- “verify existing information in the street light inventory,” record the GPS position of each streetlight, and record the visual condition of the pole, base, hand hole cover, support arm, lumi-naire, and refractor. After completing the survey, the contract obliged Royal Engineers to submit a report to the City that shows .the “condition of every streetlight, along with a summary of findings, a cost estimate for repairs, and an updated inventory list of all. streetlights.” Royal Engineers’s contract with the City, therefore, called upon it to develop and manage systems for the monitoring of the City’s streetlights, the reception of complaints concerning streetlight outages, and the coordination of streetlight repairs with the City’s selected maintenance contractor. Pointedly, it did not call upon Royal Engineers to physically maintain the City’s streetlights.
As for the remainder of the exhibits introduced in connection with its motion, Royal Engineers also introduced extracts from the deposition of Michael L. Pugh, it’s Executive Vice President, wherein he discussed the terms of Royal Engineers’s contract with the City for streetlight management services. Mr. Pugh also executed an affidavit, which Royal Engineers introduced, in which he stated that he had conducted a search of Royal Engineers’s call logs and that prior to the 115accident at suit Royal Engineers: 1) received no notice of any alleged defects in the light pole in question;. 2) received no complaints about the light pole at issue; or 3) issue any work, orders with respect to the pole at suit. Mr. Pugh further stated, that Royal Engineers: 1) did not remove or dispose of the light pole and base in question; 2) did not cause any other entity to remove the light pole and base in question; and 3) at no time had exclusive care, custody, or control over New Orleans’ streetlight system.
Additionally, Royal Engineers introduced selections from the deposition transcript of Arthur E. Westbrook, an All Star representative, who testified to Royal Engineers’s management of the streetlight program and issuance of work orders -to All Star. Royal Engineers also relied upon excerpts from the deposition of Mark Jer-nigan, director of the City’S'Department of Public Works, who explained that under the City’s system a call regarding a streetlight outage would come into Royal Engineers’s call center, which would then log the complaint, and create a work order to be issued to All Star, who was tasked with making the repair. Mr. Jemigan also testified that Royal Engineers was not obligated under terms of the contract “to dismantle the base of each of the 50,000 light poles in the City to determine the condition of the baseplate under each light pole.” .■
In his opposition, Mr. Tsegaye argued that there are sufficient facts in the record from which to draw the reasonable inference that Royal Engineers .had constructive notice of the light pole’s defective nature; Mr. Tsegaye introduced numerous exhibits in. support of this contention. He first introduced ■ extracts from |1Bthe *716 deposition of Paul Ardoin Jones, who was working as a bellhop at the W Hotel, who testified that he witnessed Mr. Tsegaye’s accident:
I was placing guests into a taxi at that time. And I heard a cracking sound and I looked to my left and I saw, you know, the pole falling, and then, like, the— .there’s a taxicab driver standing next to — there’s a fire hydrant right here, and there’s a trash can (indicating) and he was standing somewhat in this area, and then the light pole fell like this (indicating), towards St. Peters Street— South Peters, and he — like, I didn’t see the contact of him hitting the pole or the pole hitting him. But I saw the aftermath, and he was — you know, he was raising his hand doing this, blood was streaming down his arm, and he was saying my hand, my hand, screaming like — you know, really screaming cries of pain.
Mr. Tsegaye also introduced several black and white photographs. Some purport to reflect Mr. Tsegaye on the day of the accident and the injury to his hand caused by the falling light pole. Others purport to show a light pole and base, although it is not clear from the record whether these photos are of the actual pole and base at suit, or one similar to the pole and base at issue. Mr. Tsegaye also relied upon copies of the City’s contract with Royal Engineers for streetlight management services. And, like Royal Engineers, Mr. Tsegaye also introduced extracts from the depositions of Mr. Pugh, Mr. West-brook, and Mr. Jernigan.
Mr. Tsegaye additionally introduced an affidavit from Edward Johnson, an employee at the Loews Hotel, which is located across the street from the accident site. Mr. Johnson stated that he was working at Loews sometime in February or March 2011 when a light pole fell onto a coworker’s vehicle in front of the hotel. He also stated that other co-workers called the City to come and remove the fallen pole, but that it took one week for workers to arrive. This light pole, he stated, fell two to three months before the one that fell on Mr. Tsegaye.
117Mr. Tsegaye also introduced excerpts from the deposition transcript of Michael Threeton, Security Director for the Loews Hotel, who testified that he recalled when the light pole at suit collapsed. Like Mr. Johnson, Mr. Threeton also recalled the light pole which collapsed in front of Loews and damaged a co-worker’s vehicle. He stated that Loews’ employees called the City’s Department of Public Works in order to have the fallen pole x-emoved, but that it stayed on the sidewalk until later retrieved by the same work crew which also picked up the pole that fell on Mr. Tsegaye. And Mr. Tsegaye introduced excerpts from the deposition of Kevin Clark, another Loews’ employee, whose deposition testimony echoed Mr. Threeton’s.
Lastly, Mr. Tsegaye introduced an affidavit from Dr. Claude R. Mount, ;his expert metallurgist, who stated that the light pole at issue most likely failed due to internal corrosion. Although he did not have access to the light pole that fell on Mr. Tsegaye, or any rust flakes from the pole’s base, Dr. Mount analyzed rust flakes from an unspecified “failed pole.” Based on the perceived similarity of factors between the analyzed rust flakes and environmental factors found at the actual accident site, Dr. Mount concluded that the pole which fell on Mr. Tsegaye must have collapsed because of internal corrosion. He noted that visual inspection of the pole would not have revealed the internal corrosion: “Unless the shroud covering the base was removed, visual inspection of the lamp pole could not assess the condition of the very critical base attachment.” Dr. Mount *717 concluded, however, that Royal Engineers could have discovered the corrosion had it 118inspected the City’s streetlight bases with a corrosion-detecting testing device that uses broadband electromagnetic technology. On the other hand, and in light of its contract with the City, Dr. Mount opined that Royal Engineers had constructive notice of the allegedly defective pole which fell on Mr. Tsegaye: “This light pole would easily have been visible on the nightly patrols had they been properly conducted and should have alerted Royal Engineers that there was a potential problem concerning the integrity of the street light poles.”
Y
We now discuss Mr. Tsegaye’s assignments of error in light of the “field of evidence properly subject to the Court’s consideration” and the controlling law. Rand v. City of New Orleans, 14-2506, p. 5 (La.6/30/15), 173 So.3d 1148, 1151. As he did in the trial court, Mr. Tsegaye argues that summary judgment in favor of Royal Engineers is unwarranted because there are sufficient facts in the record from which to draw the reasonable inference that Royal Engineers had constructive notice of the light pole’s defective nature. He also argues that the trial judge should have relied upon the doctrine of res ipsa loquitur in order to infer Royal Engineers’s negligence and deny its motion. Lastly, Mr. Tsegaye asserts that the trial judge should have employed the spoliation doctrine in order to presume the defective nature of the fallen light pole.
A
We first address Mr. Tsegaye’s contention that there are sufficient facts in the record from which to infer Royal Engineers’s constructive knowledge of the | flight pole’s defective nature.[6] In support of his position, he first points to that provision in Royal Engineers’s contract with the City which calls for Royal Engineers to conduct a yearly daytime inspection of the light pole and its component parts. Asserting that no such inspection was ever made at any time, Mr. Tsegaye contends that Royal Engineers would have discovered the allegedly corroded nature of the subject light pole had it inspected the pole with a testing device that uses broadband electromagnetic technology so as to detect corrosion. Mr. Tsegaye next points to Royal Engineers’s contract with the City to argue that this light pole would have been discovered in the course of the weekly nighttime patrols — had they, he contends, been properly conducted — and should have alerted Royal Engineers to the allegedly defective nature of the pole. Finally, he asserts that Royal Engineers had constructive knowledge of the pole that fell on him because several the Loews Hotel employees testified that they “made numerous calls” in an effort to secure the removal of the pole which fell in front of their hotel. Had Royal Engineers responded to these calls, he reasons, it would have discovered that the pole that fell in front of Loews was corroded. Royal Engineers, he asserts, would have then examined the other light poles on the block and learned that the.pole that fell on him also suffered from corrosion.
Although we are instructed when reviewing a motion for summary judgment to view the record, and to draw all reasonable inferences that may be drawn from it, in the light most favorable to a non-movant, the facts to which Mr. *718 Tsegaye | appoints do not establish a genuine issue of material fact as to his ability to establish Royal Engineers’s constructive knowledge of the allegedly defective, light pole, See Davis v. Cheema, Inc., 14-1316, p. 5 (La.App. 4 Cir. 5/22/15), 171 So.3d 984, 987., The concept of constructive knowledge imposes a reasonable duty to discover apparent .defects in, things under the defendant’s garde. See Ladner v. Trinity Group, Ltd., 45,937, p, 9 (La.App. 2 Cir. 2/16/11), 57 So.3d 1197, 1202. Constructive knowledge can be found if the conditions that caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury. See Boutin v. Roman Catholic Church of Diocese of Baton Rouge, 14-313, p. 6 (La.App. 5 Cir. 10/29/14), 164 So.3d 243, 246-247, writ denied, 14-2495 (La.2/13/15), 159 So.3d 469.
In this- case, there are no facts in the record from which to infer the temporal element in Article 2317.1’s constructive notice requirement. Pointing to the contract’s inspection provisions, Mr. Tsegaye asserts that Royal Engineers failed to conduct either daytime or nighttime inspections and that it would have discovered the allegedly defective nature of the pole had it done so. There is, however, no evidence in the record to support the assertion that Royal Engineers failed to carry out either the yearly daytime inspections- or the weekly nighttime inspections. Although he alleges that Royal Engineers failed to live up to its contractual inspection obligations, it does not appear that Mr. Tse-gaye ever attempted to discover whether such inspections had taken place, or the date of the last |aiinspection preceding his accident. The contract called upon Royal Engineers to equip its inspection vehicles with location systems and provide the City with the results of its inspections so that the City could audit its compliance with the contract. Such information, if available, would arguably show the dates, times, and details of those daytime and nighttime inspections immediately preceding Mr. Tsegaye’s accident. Although such information is, presumably, discoverable, it does not appear that Mr. Tsegaye sought to locate these records. Absent such information, it is impossible to tell whether the pole’s allegedly defective nature existed for such a period of time that Royal Engineers should have discovered it through the inspections.
Mr. Tsegaye also argues that “numerous calls” made by Loews’ employees concerning the pole that fell in front of its establishment should have alerted Royal Engineers to the defective nature of the poles in the vicinity of the accident. It is not clear from the record, however, which entity was called by the employees. Michael Threeton, Loews’ Director of Security, testified in his deposition that “[w]e called the Department of Public Works.” Edward Johnson stated in his affidavit that he “called the City of New Orleans” to complain about the pole in front of Loews. Kevin Clark testified at his deposition that he did not think that he called “the City” about the fallen pole, though he thought that Mr. Threeton might have. One cannot infer from these statements that Loews’ employees notified Royal Engineers of the fallen pole or that the City agencies contacted by them subsequently passed on the information to Royal Engineers.
IsiAnd we observe that there is no evidence in the record with which to infer the cause of the pole’s failure. Based upon Dr. Mount’s examination of another light pole and base, Mr. Tsegaye argues that internal corrosion must have caused the pole to fall on him. This assertion, however, is pure speculation. Indeed, there is *719 no evidence in the record to even infer that the light pole at issue was inoperable on the night before Mr. Tsegaye’s accident. Accordingly, given the.dearth of evidence on the condition of the pole prior to its fall, we cannot say that Royal Engineers would have discovered the pole’s allegedly defective condition had it conducted the most thorough of inspections. Accordingly, the evidence introduced by Mr. Tsegaye in opposition to Royal Engineers’s motion does not establish a genuine issue of material fact from which to infer Royal Engineers’s constructive knowledge of the light pole’s defective nature.
B
We next address briefly Mr. Tsegaye’s contention that the trial judge erred by failing to rely upon the doctrine of res ipsa loquitur in order to infer Royal Engineers’s negligence and deny its motion. “The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses.” Tsegaye, 13-1412, p. 7, 140 So.3d at 207, citing Montgomery v. Opelousas Gen. Hosp., 540 So.2d 312, 319 (La.1989). It must, as “a qualification of the general rule that negligence is not to be | ^presumed,” be sparingly applied. See Spott v. Otis Elevator Co., 601 So.2d 1355, 1362 (La.1992).
Generally, it can be employed when three requirements are met: 1) the circumstances surrounding the event are such they would not normally occur in the absence of negligence on someone’s part; 2) the instrumentality was in the exclusive control of the defendant; and, 3) the negligence falls within the duty of care owed the plaintiff. See Zumpe v. Zara’s Little Giant Super Mkt., Inc., 09-1255, p. 5 (La.App. 4 Cir. 3/24/10), 35 So.3d 1158, 1161 n. 1. “The second requirement, that the defendant have exclusive control over the thing, has not, in our jurisprudence, been strictly applied.”. Spott, 601 So.2d at 1362. It is satisfied, however, if the circumstances indicate that it is more probable than not that' the defendant caused the accident and other plausible explanations do not appear to be the probable cause of the accident. Id. The plaintiff, of course, bears the initial burden of proof. Id.
We -do not find that the trial judge erred by refusing to apply res ipsa to the facts of this case. Mr. Tsegaye has put forth no evidence .with which to infer that Royal Engineers had exclusive control or custody over the light pole at issue. It is also clear that Mr. Tsegaye can offer nothing save possibilities and speculation in order to establish the cause of the light pole’s failure. He, therefore, has produced no factual support sufficient to establish that he will be able to satisfy his burden 'of proving that the circumstances of his accident indicate that it is more probable than | ?/tnot that it was caused by Royal Engineers. The trial judge, accordingly, did not err in refusing to apply res ipsa to the facts of this. case.
C
We lastly address Mr. Tse-gaye’s contention that the trial judge erred by refusing to apply the spoliation doctrine in order to presume the defective nature of the fallen'light pole. The theory of spoliation of evidence refers to the “intentional destruction of the evidence for the purpose of depriving the opposing parties of its use.” Quinn v. RISO Investments, Inc., 03-0903, p. 5 (La.App. 4 Cir. 3/3/04), 869 So.2d 922, 926-927. A court may “either exclude the spoiled evidence or allow the jury to infer that the party spoiled the evidence because the evidence was unfa *720 vorable to that party’s case.” Everhardt v. Louisiana Dep’t of Transp. & Dev., 07-0981, p. 7 (La.App. 4 Cir. 2/20/08), 978 So.2d 1036, 1044. In his case, Mr. Tse-gaye has also prayed for an award of punitive damages to compensate him for the spoilage. The spoliation doctrine does not apply where the litigant explains the failure to produce the evidence. See Lawrence v. City of Shreveport, 41,825, p. 11 (La.App. 2 Cir. 1/31/07), 948 So.2d 1179, 1187.
“[T]he party having control over the evidence must have had an obligation to preserve it at the time it was destroyed” before a trial judge may exclude spoiled evidence or allow for the adverse inference. Everhardt, 07-0981, p. 7, 978 So.2d at 1044, citing Kronisch v. U.S., 150 F.3d 112, 126 (2d Cir.1998). Such a duty “arises when the party has notice that the evidence is relevant to the litigation.” Id. lanOnce a court concludes that a party was obliged to preserve the evidence, it must then consider whether the evidence was intentionally destroyed and the likely contents of that evidence. See Everhardt, 07-0981, p. 7, 978 So.2d at 1044, citing Kronisch, 150 F.3d at 126.
The trial judge, in our view, correctly dismissed Mr. Tsegaye’s spoliation claim. Simply put, Mr. Tsegaye has failed to establish that he will be able to meet his burden of proving that Royal Engineers was on notice that the fallen light pole was relevant to Mr. Tsegaye’s lawsuit. The record establishes that Mr. Tsegaye’s acck dent occurred on April 15, 2011. Utility’s workers removed the fallen light pole and base on July 28, 2011.[7] Mr. Tsegaye’s petition was served on Royal Engineers on September 13, 2011. Whatever duty Royal Engineers may have had to preserve the pole and base, its duty did not arise until after it was served with Mr. Tsegaye’s petition for damages, which, in this case, post-dated the removal of the evidence in question. Accordingly, the trial judge did not err when he dismissed Mr. Tsegaye’s spoliation claim. Thus, the granting of summary judgment in favor of Royal Engineers is legally correct.
DECREE
We dismiss the appeal, but convert the motion for appeal to an application for supervisory writ, which we grant. We affirm the trial court’s granting of the partial summary judgment and, accordingly, render judgment herein in favor of [¡>fiRoyal Engineers & Consultants, L.L.C., and against Baraki Tsegaye, dismissing with prejudice his suit against Royal Engineers. All costs of the appeal are taxed to the appellant. See La. C.C.P. art. 2164.
APPEAL DISMISSED; CONVERTED TO SUPERVISORY WRIT; WRIT GRANTED; INTERLOCUTORY RULING AMENDED AND, AS AMENDED, AFFIRMED

. Notably, the decision relied upon by Mr, Tsegaye involved a judgment that not only sustained an exception of prescription but also dismissed the plaintiff's claims against the exceptor with prejudice. See Bell v. American International Group, 06-1242, p. 2 (La.App. 3 Cir. 2/7/07), 950 So.2d 164, 166 (“Following a hearing on the exception, the trial court took the matter under advisement and then rendered a judgment sustaining Mark & Emmett's exception and dismissing Bell's claims with prejudice:”). Thus) it provides no support for Mr. Tsegaye’s position.

. Mr. Tsegaye’s lawsuit against two other defendants was previously dismissed. See Tsegaye v. City of New Orleans, 14-1412 (La.App. 4 Cir. 4/16/14), 140 So.3d 202.

. See also La. C.C.P. art. 1915 A(3) ("Grants a motion for summary judgment, as provided by Articles 966 through 969, but not including a summary judgment granted pursuant to Article 966(E).").

.We have previously suggested that an intermediate appellate court, when confronted with the confluence of Herlitz factors in an *712 application for the exercise of its discretionary supervisory jurisdiction, may abuse its discretion when it fails to exercise its supervisory jurisdiction to review the application. See Hooper v. Brown, 15-0339, p. 1 n. 1 (La.App. 4 Cir. 5/22/15), 171 So.3d 995, 997; MR Pittman Group, LLC v. Plaquemines Parish Government, 15-0395, p. 4 (La.App. 4 Cir. 9/16/15), 176 So.3d 549, 552 n. 5.

. Article 2315 of Louisiana’s Civil Code provides in part that "[ejvery act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.”

. Mr. Tsegaye concedes that Royal Engineers had no actual knowledge of the light pole’s condition prior to his accident.

. The trial judge has already dismissed Mr. Tsegaye's spoliation claims against the City, All Star, and Utility. Mr. Tsegaye did not appeal the dismissal of his claim against the City, and we concluded that he abandoned the spoliation issue with respect to All Star and Utility. See Tsegaye, 13-1412, p. 9, 140 So.3d at 208.