PAUL A. BONIN, Judge.
I,At the prompting of its local counsel, Brennan’s Inc. engaged the services of Maryland attorney, Edward Tuck Colbert, because of his specialized expertise in trademark-infringement law an^ litigation. At the time, Brennan’s owned the world-famous New Orleans restaurant of the same name, along with registered trademarks and trade names.[1] Younger rela *1104 tives of Brennan’s shareholders were emerging restaurateurs who, naturally, were interested in exploiting, their family name in order to attract customers to their own emerging restaurants.
Mr. Colbert drafted proposed agreements for the principals of Brennan’s to execute with two of their cousins, Dickie Brennan, Jr. and Ralph Brennan. The agreements, as drafted, generally addressed the means by which Dickie and Ralph would avoid confusion of their restaurants and restaurant groups with Brennan’s. Our matter derives from the agreement executed with Dickie- and the litigation which followed.
| gBrennan’s, represented by its local counsel, sued Dickie, his companies, and his father in federal court. Shortly before the trial began, Mr. Colbert, who is not a Louisiana-licensed attorney, enrolled pro hac vice for Brennan’s and had primary responsibility for Brennan’s representation at trial and on the f/rst appeal. The jury awarded Brennan’s $250,000 in damages for Dickie’s breach of the agreement, but refused to rescind the- agreement. And, finding the agreement precluded Brennan’s trademark-infringement claims, the federal district trial judge refused to submit those claims to the jury. But the federal appeals court reversed and remanded for a new trial on the trademark-infringement claims, subject to a preclusion of double-recovery by Brennan’s on account of the contractual damages awarded.
At that point¡ Brennan’s terminated Mr. Colbert’s representation. Brennan’s new counsel jettisoned the trademark-infringement claim and,’ contrary to Mr. Colbert’s advice, filed a new federal complaint by which it sought to enforce Brennan’s unilateral termination of its agreement with Dickie, which termination relied upon Article 2024 of the Louisiana Civil Code. Holding that any such claim should have been asserted by Brennan’s in its first suit and despite the protestations of Brennan’s new counsel 'by which he sought to distinguish the “new” claim under Article 2024, the same federal district judge dismissed the second suit on grounds of res judicata. The federal appeals court affirmed.
| ¿Perceiving the results of the federal litigation as unfavorable and, we expect, facing Mr. Colbert’s billing in excess of two million dollars, Brennan’s instituted this malpractice suit against Mr. Colbert and his law firm, Kenyon & Kenyon.[2]
Brennan’s claims that Mr. Colbert’s legal representation deviated below the standard of care required for attorneys in New Orleans all relate to either the drafting of the agreement with Dickie or Article 2024. Mr. Colbert filed a motion for summary judgment by which he asserted that Brennan’s .was unable to prove an essential element of its malpractice claim — to wit, the deviation below the standard of care— because it had no expert witness to testify as to the standard of care. Brennan’s opposed the motion, arguing that it needed no expert legal testimony because Mr. Colbert’s deviation from the standard was so patently negligent that. the trial judge could take judicial noticé of it.
The trial judge agreed with Mr. Colbert that any deviation below the standard by him was not so ■ recognizable such that expert testimony was not required and granted summary judgment. On our de novo review, we too find that Brennan’s, under the circumstances of this case, could *1105 not establish the standard .of care for attorneys in New Orleans without expert testimony and, failing to produce such testimony, cannot prove an essential element of its malpractice claim. We thus affirm the trial court’s summary judgment.
The summary judgment as granted, however, although designated as final for the purposes of appeal and indicating that all matters were concluded, , did not 14contain any decretal language. Because we were concerned that there may be issues outstanding that were not finally resolved by this summary judgment, we' examined an earlier motion for summary judgment by Mr. Colbert which resulted in a 2008 partial final summary judgment in his favor determining that some of Brennan’s claims were perempted and in an interlocutory judgment denying summary judgment on other, of Brennan’s claims. The 2008 partial summary judgment had not been designated as final for purposes of appeal. The parties dispute whether the summary judgment which we have under review superseded- or otherwise mooted the 2008 partial summary judgment, which would then allow us- to amend the 2011 summary judgment and dismiss with prejudice Brennan’s lawsuit.
Our examination of the earlier motion and the resulting non-appealable judgments satisfies us that we cannot exercise our appellate jurisdiction over the partial summary judgment which dismissed certain malpractice claims as perempted. Accordingly, we conclude that because our decision today does not dispose of all outstanding issues in this case, we must remand the single matter of the 2008 partial summary judgment (the peremption judgment) to the trial court for its further disposition.
In the Parts that follow, we explain our decision in considerably greater detail,.
JjJ
We begin with a comprehensive overview of this matter’s extensive procedural history. Because Brennan’s petition asserts that Mr. Colbert deviated below the standard of care with respect to his drafting of the agreement with Dickie, his representation of Brennan’S at trial in federal district court, and his representation of Brennan’s before and after its appeal to the United States Court of Appeals for the Fifth Circuit, our overview of the procedural history encompasses these events.
A
The origins of the present controversy can be traced back to 1998, when Brennan’s first'became aware that Dickie had begun construction bn his steakhousé three blocks from its restaurant. Its principals (Pip, Jimmy and Ted Brennan) then consulted with Leon Rittenberg, Jr., a local attorney, on how best to protect its trade and service marks. Importantly for our purposes, Mr. Rittenberg advised Brennan’s to retain Mr. Colbert because of his expertise in intellectual property issues. According to Brennan’s, Mr. Colbert and Mr. Rittenberg then advised its principals to meet with Dickie and discuss how they could collectively manage the use of the Brennan family name in connection with their respective restaurants. In the wake of this meeting, Mr. Colbert prepared an agreement — now referred to by the parties and courts as the “1998 Agreement” — that was subsequently executed by both Brennan’s and Dickie.
|fiThe 1998 Agreement, as prepared by Mr. Colbert: 1) recognizes that both parties are engaged in the restaurant business in the New Orleans area; 2) acknowledges that Brennan’s is the owner of numerous service marks and trademarks;[3] and, ■ 3) *1106 notes that Dickie operates two restaurants in New Orleans that he desires to promote via the use of his name. In light of these statements, the parties then declared that they “are' mutually desirous of avoiding any confusion of the trade or public as to the origin, affiliation or sponsorship of any restaurants operated by. them.”
For its part, Brennan’s stated that it would not object to Dickie’s operation of restaurants under the name and marks “Dickie Brennan’s Palace Cafe” and “Dick-ie Brennan’s Steakhouse” provided “he arranged the words in certain ways, did not use certain typefaces, and refrained from using words (such as ‘original’ or ‘famous’) that would suggest a commercial connection to, Brennan’s.” Brennan’s Inc. v. Dickie Brennan & Co. Inc., 376 F.3d 356, 366 (5th Cir.2004). Dickie, for his part, was obligated to keep his commercial use of the family name within the restrictions of the agreement and promptly notify, and cooperate with, Brennan’s to eliminate any confusion between the two parties in the event he became aware “of any perceived likelihood' of confusion or any instance of actual confusion as the result of the use made by each party of their respective marks.”
|7The final 1998 Agreement as modified by Dickie, and approved by Brénnan’s, incorporated all of the foregoing provisions, but: 1) provided that Dickie’s' full name could be rendered in script style, per an exhibit attached to the agreement; 2) modified the draft agreement’s prohibition oh Dickie’s assignment of rights to indicate that the rights could he “assigned to the heirs hereto;” and 3) struck a provision indicating the Dickie has not, and will not, apply to register any mark containing the name “Brennan’s.”
B
1
Family comity, however, proved to be short-lived. Contending that its customers had experienced brand confusion concerning the relationship between its establishment and Dickie’s two restaurants, Brennan’s, as well as Pip, Jimmy, and Ted in their individual capacities, filed suit in federal district court in 2000 against Dickie, Richard, Sr., Dickie Brennan and Company, Inc., Seven Sixteen Iberville, L.L.C., and, Cousins Restaurants, Inc.[4] Neither its federal claim, nor any of its amending claims, however, were introduced into evidence or attached to the record now before us.. .
While we need not linger long on motion practice before the district court, it is important to note that the district judge made several pre-trial rulings that both narrowed the scope of Brennan’s claims and formed the groundwork for several of its present malpractice allegations. First, the district judge -ruled that the 1998 | «Agreement barred Brennan’s from pursuing trademark-related claims against Dick-ie and his companies, thus limiting, its recovery to damages for breach of contract unless it could show that the agreement should be rescinded because of fraud or “serious breach.” Similarly, she also concluded that Dickie’s companies could exercise the rights afforded Dickie under the 1998 Agreement, thus barring Brennan’s from pursuing trademark infringement claims against these defendants.[5]
*1107 Trial on- Brennan’s claims took place in the autumn of 2002.- The district judge, with the cohsent of the parties, bifurcated the trial with the liability and damages phases tried separately. After deliberations, the jury returned a verdict on liability' by answering special -jury interrogatories, which the district judge summarized in' her subsequent judgment. The jury, she noted, first concluded that Dickie “did not fraudulently induce Brennan’s to enter into the 1998 Agreement.” It, nevertheless, found that Dickie’s use of the Brennan name in connection with the steakhouse and the corporate entity Dickie Brennan & Coi “breached the 1998 Agreement by using the name ‘Brennan’s’ in a manner not authorized by the 1998 Agreement.” [6] .
The jury-next,, concluded that, there “exists a likelihood of confusion inconsistent with the intention of the 1998 Agreement with respect to [Dickie’s] use of the name ‘Brennan’s.’” Dickie, it. found, “became aware of a perceived likelihood of confusion or instances of actual confusion” but failed to both notify 19Brennan’s and take prompt measures, in concert with Brennan’s, to eliminate such confusion. It nevertheless concluded that both Dickie and Brennan’s acted, at all times, in good faith. The jury, finally, determined that although Dickie breached the 1998 Agreement, his breach was “not sufficiently serious to justify dissolution of the 1998 Agreement.” The jury, accordingly, resolved that Dick-ie’s breach could,be remedied by requiring him to specifically perform his obligations under the 1998 Agreement. Thereafter, the jury heard evidence on damages and returned a verdict in which it awarded Brennan’s $250,000 for Dickie’s breach of the 1998 Agreement. The district judge then entered a, judgment on the jury’s verdicts.
2
Brennan’s then' appealed the judgment to the United States Court of Appeals for the Fifth Circuit. See Brennan’s Inc., 376 F.3d at 361. While it raised several assignments of error, only one is relevant to the present controversy. Brennan’s, specifically, challenged the district judge’s ruling that it was limited solely to contractual remedies so long as the 1998 Agreement remained in force, and that trademark remedies would only be available if it could avoid the agreement by proving fraud in its inducement or a breach sufficiently serious to warrant its dissolution.[7] • |10In addressing this argument, the Fifth Circuit, applying Louisiana law, turned to the language of the 1998 Agreement. Noting that the parties could not agree on whether the 1998 Agreement constituted a license agreement or a consent-to-use agreement, the court first set out to characterize the contract. A license agreement, the court wrote, “gives one party the right to use another party’s mark’ (i.e., to engage in otherwise infringing activity), generally in exchange for a royalty or other payment.” Brennan’s Inc., 376 F.3d at *1108 364. “With regard to licenses, the prevailing view is that one who exceeds the scope of the license is potentially liable not just for breach of the license agreement but also for trademark infringement.” Id.
A consent-to-use agreement, the Fifth Circuit noted, is a contract in which the owner of a mark consents to another party’s defined usage of another mark so long as the second party keeps within the limits of the defined zone of use. Id., citing 2 McCarthy on Trademarks and Unfair Competition § 18:79 (4th ed.2004). In other words,' the owner of the first mark admits that the defined use is not an infringement and that he will not sue the second mark-holder for such usage. Id. A consent-to-use agreement, therefore, “ ‘[i]s not an attempt to transfer or license the use of a trademark .,. but fixes and defines the existing trademark of each ... [so] that confusion and infringement may be prevented.’ ” Brennan’s Inc., 376 F.3d at 364, quoting Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1076 (5th Cir.1997). A contract will ordinarily be characterized as a consent-to-use agreement when ‘“an authorization of trademark use is structured in such a way as | nto avoid misleading or confusing consumers as to the origin and/or nature of the respective parties’ goods.’” Brennan’s Inc., 376 F.3d at 364, quoting Exxon Corp., 109 F.3d at 1076. Like the party suing for breach of a license agreement, a party suing for breach of a consent-to-use agreement can pursue contractual remedies. See Brennan’s Inc., 376 F,3d at 368. Unlike a party suing for breach of a license agreement, a party suing for breach of a consent-to-use agreement can only pursue trademark remedies for uses outside of those contemplated and permitted in the agreement. See Brennan’s Inc., 376 F.3d at 366-367.
The court characterized the 1998 Agreement as a consent-to-use agreement because it “expressly provides that the parties’ aim in executing the. agreement is ‘avoiding any confusion of the trade. or public,’ obligates Dickie to take remedial action to reduce consumer confusion even in the absence of a breach, and thus limits Brennan’s preexisting right to pursue potential trademark actions provided that Dickie arranged.... [his use of the family name] in certain ways, did not use certain typefaces, and refrained from using words ... that would suggest a connection to Brennan’s.” Brennan’s Inc., 376 F.3d at 364, 366. The court, accordingly, held that the language of the agreement “cannot be taken to mean that Brennan’s has implicitly given up its preexisting right tó pursue trademark claims as to unauthorized uses.” Brennan’s Inc., 376 F.3d at 367. The district judge, therefore, erred in finding that the contract by its terms can be set up as a defense to usages that are unauthorized by the agreement.' See Brennan’s Inc., 376 F.3d at 367.
|iaThe Fifth Circuit thus remanded the matter to the district court with several instructions and observations. It first noted that “since the still-in-force 1998 Agreement permits Dickie to make certain uses of his name in connection with his restaurants, Brennan’s can prevail on its trademark claim only to the extent it shows that incremental Confusion would likely result from Dickie’s unpermitted uses.” Brennan’s Inc., 376 F.3d at 367. It next observed that “assuming that Brennan’s can prove infringement, the jury’s- previous finding that Dickie acted in good faith might preclude an award of any trademark remedies that require a showing of willfulness.” Brennan’s Inc., 376 F.3d at 368. Observing, next, that Brennan’s had already recovered $250,000 in lost profits in -connection with its breach of contract claim, the court then cautioned that any further recovery of trademark infringement damages must not be duplicative of the jury’s prior award for lost profits. See *1109 Brennan’s Inc., 376 F.3d at 368. Because of these limitations, the court pointedly observed, “Brennan’s might not be able to achieve any more relief against Dickie than it has already attained, despite the fact that the district court should have let it pursue an infringement case.” Brennan’s Inc., 376 F.3d at 368.
Lastly, in a footnote ruminating on its conclusions- concerning the contractual limitations on Dickie’s liability for. trademark infringement, the court noted that while a consentee’s non-compliance with the terms of an agreement would, in many cases, terminate the contract and relieve the mark-holder of his contractual obligation to allow the specified uses, the jury in Brennan’s' case was | iainstructed that it had the discretion to consider the severity of Dickie’s breach, his good faith, vel non, and “the relative fairness of the two methods of dealing with the breach,” and decide whether to declare the 1998 Agreement at an end or order Dickie to specifically perform the contract. Brennan’s Inc., 376 F.3d at 367 n. 6. Although it refused to comment on the propriety of the jury instruction, the court, nevertheless,- observed that “Brennan’s has not challenged this aspect of the instructions on. appeal.” Brennan’s Inc., 376 F.3d at 367 n. 5.
3
Upon remand, however, Brennan’s declined to .pursue a trademark infringement case as delineated by the Fifth Circuit, electing, instead, to terminate Mr. Colbert’s services, retain Joseph Mole as new counsel, and dismiss its remaining trademark remedies. Mr. Mole first sent a sixty-day notice to Dickie on August 5, 2004, stating that Brennan’s was electing to terminate the 1998 Agreement pursuant to Article 2024 of the Louisiana Civil Code and ordering Dickie to cease all use of his family name in connection with his restaurants.[8] Mr. Mole then filed suit in federal district court on October 14, 2004, against Dickie, Dickie Brennan and Company, Inc., Cousins Restaurants, Inc., and Seven Sixteen Iberville, L.L.C., in which Brennan’s asserted that the defendants were in violation of the 2002 judgment because they continued to ignore instances of actual confusion caused by Dickie’s use of the family name, failed to take any steps to prevent such confusion, and engaged in activity designed to cause further | uconfusion in customers’ minds. Brennan’s, accordingly, prayed for: 1) a declaratory ruling that its August 5, 2004 notice to Dickie effectively dissolved the 1998 Agreement; and, 2) a judgment enjoining Dickie from using his family name in connection with his restaurants.
Dickie responded with a Motion to Dismiss on the basis of res judicata. The district judge agreed, ruling: “The time for Brennan’s to litigate whether the 1998 Agreement was terminable at will under Article 2024 was in the prior suit in which it sought to terminate the agreement based on a breach thereof. Brennan’s, Inc. is now barred by res judicata from seeking to terminate the agreement in a new suit based on a new theory.” The Fifth Circuit affirmed the district judge’s ruling. See Brennan’s Inc. v. Brennan, 150 Fed.Appx. 365 (5th Cir.2005).
C
1
Brennan’s then, on June 23, 2005, brought a claim for malpractice against Mr. Colbert, his law firm of Kenyon & Kenyon, Mr. Rittenberg, and his law firm of Baldwin Haspel, L.L.C. Brennan’s alleged that Mr. Colbert was negligent and deviated below the standard of care in drafting the 1998 Agreement and failing to *1110 prepare a license agreement as opposed to a consent-to-use agreement. It also asserted that Mr. Colbert failed to include in the 1998 Agreement royalty provisions, “a term,” and breach of contract provisions for the recovery of attorney’s fees, costs, and specified damages. And by failing to include such 11(iterms, Brennan’s pled, Mr. Colbert impaired, or ’ diminished, the strength of Brennan’s trademark claims.
Brennan’s also contended that Mr. Colbert’s representation in district court deviated below the standard of care by failing to assert the claim to terminate the 1998 Agreement pursuant to Article 2024. And Brennan’s argued that Mr, Colbert’s appellate, and post-appellate, representation deviated below the standard of care because he failed “to assert on appeal the issues regarding termination of the contract.” Brennan’s, Mr. Colbert, and the trial judge below have consistently interpreted' this obliquely worded assertion of negligence to refer to Mr. Colbert’s alleged failure to appeal the district court jury instruction on contract remedies and rescission. See Brennan’s Inc., 376 F.3d at 367 n. 5. Brennan’s, additionally, claimed that Mr. Colbert deviated below the standard of care by failing to advise it of the potential res judicata effect of his own failure to assert contract termination claims in the district and circuit courts. Brennan’s, accordingly, prayed for an award of damages from Mr: Colbert, and a judgment declaring that Mr. Colbert was not entitled to the asserted $2,000,000 in unpaid legal'fees.'
Mr. Colbert answered Brennan’s suit and reconvened, in which he asserted, among others, a claim for open account against Brennan’s for $2,124,199.72 in unpaid legal fees.[9] See La. R.S. 9:2781. Mr. Colbert also filed a peremptory exception of no cause of action/partial, motion for summary judgment based on | ^peremption in which he argued that Brennan’s claims are time-barred by operation of Section 5605 of Title 9 of the Louisiana Revised Statutes.[10] On May 14, 2008, the trial *1111 judge denied Mr. Colbert’s partial motion for summary judgment with respect to all of Brennan’s claims regarding alleged acts of negligence transpiring prior to September 4, 2001 — the date Mr. Colbert was admitted pro hac vice to practice in Louisiana before the district court — and Mr. Colbert’s failure to assert |17on appeal the issues regarding termination of the contract. On the other hand, the trial judge granted in-part Mr. Colbert’s partial .motion for summary judgment as to all alleged acts of negligence which occurred after September s, 2001, and would have been extinguished by peremption. Mr. Colbert’s partial motion, therefore, secured the dismissal of Brennan’s claim that-he deviated below the standard of care by failing to assert a termination claim in accordance with Article 2024 in district court. All other claims, however, remained actionable. Mr. Colbert unsuccessfully sought our supervisory review of this adverse interlocutory ruling. See Brennan’s, Inc. v. Colbert, unpub., 08-776 (La.App. 4, Cir. 09/29/08). The Louisiana Supreme Court, likewise, denied writs. See Brennan’s, Inc. v. Colbert, 08-2573 (La.1/9/09), 998 So.2d 721 (Mem).
The parties then engaged in discovery and additional motion practice. Notably, Mr. Colbert filed a motion for summary judgment in December 2010 seeking the dismissal of Brennan’s remaining claims. He first argued that the evidence attached to its motion established that that there is no genuine issue of material fact that: 1) the 1998 Agreement was the type of agreement that Brennan’s wanted and requested Mr. Colbert to prepare; and, 2) the document prepared by Mr. Colbert was the only type that Dickie ■ would have signed. In light of the fact that Brennan’s could point to no evidence to support its assertion that it asked him to include royalty provisions, breach of contract remedies, or temporal limitations - in the 1998 Agreement, Mr. Colbert argued, it could not without legal expert testimony meet its burden of proving that he deviated below the standard of | tscare by failing to include such terms and conditions. Pointing out that Brennan’s had not listed a legal ex: pert as a witness, Mr. Colbert then argued that-summary judgment was warranted because, absent such an expert, Brennan’s cannot meet its burden of establishing the legal malpractice action’s standard-of-care, breach, and causation elements.
With -respect to Brennan’s ■ claim that Mr. Colbert negligently failed to appeal, per the Fifth Circuit’s footnote 5 ruminations, the federal district court jury instruction, Mr. Colbert argued that summary judgment was wárranted because the instruction given correctly stated Louisiana contract law on remedies and rescission. He also pointed out that an alternate instruction based upon federal law would not have materially changed the charge given to the jury because the jury would still be required under this body of law to weigh the evidence and determine *1112 whether contractual rescission was an appropriate remedy. And he argued that Brennan’s assertion that he failed to advise it of the potential adverse effects of 'post-litigation and/or unilateral termination of the 1998 agreement “are without legal or factual merit.”
In response, Brennan’s first challenged Mr. Colbert’s contention that there are no genuine issues of material fact. It next claimed that Mr. Colbert’s argument on this point was misplaced because he failed to buttress it with any pertinent legal support. Brennan’s then argued that it needed no legal expertise because it could rely upon Mr. Mole — a designated fact witness — or the trial judge to establish the relevant standard of care. Citing to Ramp v. St. Paul Fire and Marine Ins. Co., 263 La. 774, 787, 269 So.2d 239, 244 (La.1972), Brennan’s, similarly, argued that Mr. Colbert’s negligence was so patently obvious, that the trial judge could take judicial notice of it. Brennan’s responded to Mr. Colbert’s jury instruction -arguments by pointing solely to the Fifth Circuit’s footnote 5 musings as evidence of his obvious error., And it argued that Mr. Colbert’s challenge to Brennan’s failure-to-advise claims should be denied because it is based on contested facts.
The parties argued the merits of Mr. Colbert’s motion before the trial judge on March 18,2011. At the hearing, it came to light that the deadline for the posting of a jury bond lapsed ten days prior to oral argument. Given this development, and the parties’ debate over Brennan’s need, vel non, to present expert legal testimony the trial judge observed: .
Then the question becomes do I consider myself a legal expert and whether or not that particular issue should have been appealed to the jury, whether or not this Court considers itself an expert on intellectual property. On that issue I can suggest to you that-I’m not. The contractual aspects of it I might be able to get through. ' I know absolutely nothing about intellectual property. I didn’t take it as a matter of course, I have not had a case other than this one relative to intellectual property. So if, in fact, this now is a judge trial, my ruling doesn’t change.
After finding no genuine issue of material fact, and that Brennan’s needed a legal expert to opine on the applicable standard of care, the trial judge granted Mr. Colbert’s motion. The subsequent written judgment, dated March 29, '2011, dismissed with prejudice “Brennan’s, Inc.’s claims for legal malpractice against |2pEdward Tuck Colbert and Kenyon & Kenyon., LLP.”[11] Subsequently, the trial judge signed a “Final Judgment” on June 14, 2011, in which, after finding no just reason for delay, he designated as final: 1) the March 29, 2011 judgment granting Mr. Colbert’s motion for summary judgment on Brennan’s malpractice claims; 2) the March 28, 2011 judgment that granted Pip, Jimmy, and Ted’s motions for summary judgment and dismissed that portion of Mr. Colbert’s reconventional- demand which sought to hold them personally liable for Brennan’s corporate debts;[12] and, 3) the March 31, *1113 2011 judgment granting Mr. Colbert’s motion for summary judgment, on his open account claim.[13] See La. C.C.P. art. 1915 B(l).
2
On July 14, 2011, Brennan’s filed k motion to fix security and for suspensive appeal. The trial judge signed the order, granted Brennan’s motion, and set a show cause hearing on its request to fix security. Noting that the amount required to secure a suspensive appeal is statutorily set, and that the delays for perfecting a suspensive appeal are not suspended pending the resolution of the security issue, Mr. Colbert filed a motion urging the trial judge to deny Brennan’s motion and |¾1 convert its appeal to a devolutive one. Prior to the hearing, however, Mr. Colbert learned that Brennan’s counsel filed its motion for sus-pensive appeal after she had been declared ineligible on June 7, 2011, to practice law for failure to meet the applicable continuing legal education requirements. See Rule XXX, Regulation 6.5, Rules of the Supreme Court of Louisiana. He, accordingly, supplemented his arguments by urging the trial judge to dismiss Brennan’s appeal because the order was obtained when its .attorney was ineligible to practice law. By way of judgment dated September 28, 2011, the trial judge denied Brennan’s motion to fix security and granted Mr. Colbert’s motion, noting that “Brennan’s, Inc.’s appeal, if any, is devolutive.” He further gave Brennan’s two weeks to brief the legal effectiveness of those pleadings filed by its former attorney, after which the court would, take the matter imder advisement.
In response to- the trial judge’s request for additional briefing, Brennan’s, under new counsel, sidestepped the issue of the effectiveness of its prior motion for appeal by pointing out that the judgment which denied its motion for new trial and the June 14, 2011 “Final Judgment” were also granted while Brennan’s was represented by ineligible counsel. Conceding that its prior attorney was ineligible to practice at the time of the foregoing judgments, Brennan’s urged the trial judge to vacate the foregoing judgments. and grant it a new trial on the issues of security and the conversion of its appeal , to a devolutive one.. • .
Before he could rule on Brennan’s motions to vacate and for new trial, the trial judge signed an order .on November. 18, 2011, upon Mr. Colbert’s urging, |a2which granted Brennan’s a devolutive appeal in accordance with its own motion for appeal and the September 28, 2011 judgment that converted Brennan’s appeal to a devolutive one.[14] The subsequent order noted that “Brennan’s, Inc. be and hereby is granted a devolutive appeal of the foregoing ‘judgments of this Court, including, but not limited to the denial of Brennan’s Motions for New Trial on its Legal Malpractice Claims and Defendants’ claim of Open Account; returnable to the Court within the applicable delay fixed by law.”[15]
*1114 Brennan’s subsequent appeal was lodged in this Court under docket number 2012-CA-0145. Mr. Colbert moved to dismiss Brennan’s appeal for lack of jurisdiction and procedural defects, e.g., the November 18, 2011, order of appeal that he prepared on Brennan’s behalf, We, however, remanded the matter to the trial court after determining that the record was incomplete. See Brennan’s Inc. v. Colbert, unpub., 12-0145 (La.App. 4 Cir. 12/12/12), 2012 WL 6560967.
On remand, the parties attempted to compromise their respective claims. Acting upon Brennan’s motion, the trial judge signed an order on March‘8, 2013, which purported to dismiss the November 18, 2011 order of appeal. On May 9, 2013, however, Brennan’s asked the trial judge to reconsider and vacate her March 8, 2013 dismissal order. It also, on May 9; 2013, filed a motion for devolutive appeal of the March 8, 2013 order of dismissal. The trial judge, on May 9, 2013, | asset a June 13, 2013 show-cause hearing on Brennan’s motion to vacate the March 8, 2013 order, and granted Brennan’s motion for a devol-utive appeal of the March 8, 2013 order. After the appeal record was lodged in this Court, Mr. Colbert filed a motion to dismiss; We granted the motion, and dismissed the appeal, after concluding that the trial judge’s March 8, 2013 dismissal “is absolutely null and void' because the prior appeal, that which was docketed in this court under our docket number 2012-0145, was still pending in this court, having only been returned to the trial court for supplementation of the-record for the appeal and upon return to this court to be assigned a new docket number.” Brennan’s, Inc. v. Colbert' 13-0943, p. 6 (La. App. 4 Cir.' 9/25/13), 125 So.3d 537, 540-541, (on reh’g) (emphasis in original). On rehearing, we clarified that ..our ruling “does not address the appeal of the matters appealed in case number 2012-CA-0145, wherein our decision remanded the case to the trial court for completion of the record.” Brennan’s Inc., 13-0943,. p. 7, 125 So.3d at 541 (on reh’g). “Once re-docketed with the missing transcripts and documents under a new docket number in the court,” we explained, “that appeal may proceed and Brennan’s Inc. may ask. this court to dismiss its appeal.” Id.
The’ record- has -finally been completed, and' Brennan’s appeal has now been re-docketed under the present case number. It has not asked us, however, to dismiss its appeal.[16] Rather, in October 2013 an involuntary Chapter 7 bankruptcy j^claim was filed in the United States Bankruptcy Court for the Eastern District of Louisiana. A- Chapter 7 Trustee was appointed, who retained new counsel to pursue this appeal. See, e.g., Brennan v. Brennan, unpub., (E.D.La.2014), 2014 WL 3489781.
II
In this Part, we turn-to consider the statutory law and jurisprudence that governs attorney malpractice claims and our review of the correctness of the granting of the motion for summary judgment in favor of Mr. Cdlbért and against Brennan’s. •.
■A
There are three essential elements of a legal malpractice claim, In order to establish a valid legal malpractice claim, the plaintiff must • show evidence sufficient to convince a reasonable trier of fact of: 1)' the existence of án attorney- *1115 client relationship; 2) negligent representation by the attorney; and 3) loss caused by that negligence. See MB Industries, LLC v. CNA Ins. Co., 11-0303, p. 15 (La.10/25/11), 74 So.3d 1173, 1184. Once a prima facie case of malpractice has been made by the plaintiff, the burden of proof shifts to the defendant, who bears the burden of proving that the litigation would have been unsuccessful. See Crescent City Prop. Redevelopment Ass’n, LLC v. Hardy, 11-1292, p. 5 (La.App. 4 Cir. 4/18/12), 89 So.3d 1270, 1273.
We apply a de novo standard of review in examining trial court rulings on summary-judgment motions. See Lewis v. Young, 15-0798, p. 3 (La.App. 4 Cir. 2/24/16), 187 So.3d 531, 534. In reviewing such judgments, appellate courts utilize the same criteria that govern the district court’s consideration of whether summary judgment is appropriate: whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. See Rapalo-Alfaro v. Lee, 15-0209, p. 8 (La.App. 4 Cir. 8/12/15), 173 So.3d 1174, 1179. A court must grant a motion for Summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. See La. C.C.P. art. 966 B; Rapalo-Alfaro, 15-0209, p. 8, 173 So.3d at 1179.[17]
On a motion for summary judgment, the burden of proof remains with the movant. See La. C.C.P. art. 966 C(2). If the moving party will not bear the burden of proof on the issue at trial, .however, and points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. See La. C.C.P. art. 966 C(2). If the opponent of the motion fails to do so, |aithere is no genuine issue of material fact and summary-judgment should be granted. See La. C.C.P. art. 966 C(2).
C
Here, Brennan’s at a trial on the merits would bear the burden of proof With respect to each of the elements comprising the legal malpractice cause of action. See Palumbo v. Shapiro, 11-0769, p. 13 (La.App. 4 Cir. 12/14/11), 81 So.3d 923, 930. Brennan’s, it is' conceded by Mr. Colbert, has carried its burden of establishing an attorney-client relationship. But Brennan’s also must prove that Mr. Colbert failed to “exercise at least that degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality.” Ramp, 263 La. at 786, 269 So.2d at 244. And Brennan’s also bears the burden of proving that it suffered a loss as a result of Mr. Colbert’s actions or inac-tions. See Thibodeaux v. Braud & Gallagher, L.L.C., 12-0904, p 4 (La.App. 4 Cir. 1/31/13), 109 So.3d 501, 503. Brennan’s, thus, has the burden of establishing “some causal connection between the alleged negligence and the eventual unfavorable outcome of the litigation.” Rondeno v. Law Office of William S. Vincent, Jr., 12-1203, p. 15 (La.App. 4 Cir. 3/13/13), 111 So.3d 515, 524, quoting MB Industries, 11-0303, p. 20, 74 So.3d at 1187. And most importantly for the purposes of this case, Brennan’s failure to prove any one of these *1116 elements is fatal to its claims against Mr. Colbert. See Thibodeaux, 12-0904, pp. 4-5, 109 So.3d at 503.
Typically, a plaintiff retains an expert witness both to establish the standard of care for prudent attorneys in the relevant locality and to show that the ^defendant’s actions fell below the standard of care. See MB Industries, LLC, 11-0303, p. 15, 74 So.3d at 1184. In Ramp, however, the Supreme Court recognized that expert testimony is not always necessary; an expert is not necessary where the alleged legal malpractice is “obvious” or the defendant attorney committed “gross error.” 263 La. at 787, 269 So.2d at 244. But also see Houillon v. Powers & Nass, 530 So.2d 680, 682 (La.App. 4th Cir.1988) (“With the complexity and diversity of contemporary law, litigation, and legal practice, it should not be surprising to find legal malpractice cases in which expert testimony as to the standard of care is essential.”).
Ill
We turn now to discuss the field of evidence available to the trial judge at the hearing on Mr. Colbert’s motion for summary judgment.
Mr. Colbert, in support of his motion, introduced an affidavit from attorney Rit-tenberg, excepts from Dickie’s deposition testimony, a copy of a November 3, 2003 correspondence from Mr. Rittenberg to Mr. Colbert forwarding a draft of Notice of Termination to Dickie, Mr. Colbert’s February 18, 2004 response to Mr. Ritten-berg, a copy of the 1979 Settlement Agreement between various restaurateur members of the extended Brennan family and their respective business entities, a copy of Brennan’s complaint from its 2004 federal lawsuit, a copy of one of Mr. Colbert’s billing entries,, and copies of trademark license agreements by and | ^between Brennan’s, Burt Wolf Enterprises, Brennan’s Party Center, Inc., Creole Restaurant Partners, L.P., and TJO, Inc.[18]
Notably, Dickie testified at his deposition that the present controversy began when he was contacted by one of his cousins inviting him and his cousin Ralph to a meeting with Pip, Jimmy, and Ted at the Royal Orleans Hotel. Dickie noted that the tenor of the meeting was light, though it did touch on one item of business: “at some point, it was communicated that — I was in the middle of building out Dickie Brennan’s Steakhouse — and it was communicated that there was some conversation with their trademark attorneys and they were happy for me to be building the restaurant but would like — but that there should be some things that they need to do to protect the trademark.” Neither Pip, Jimmy, nor Ted, however, opined that his use of his name in connection with the steakhouse constituted trademark infringement.
Recalling no other.details of the agreement as proposed, Dickie stated thát the conversation soon drifted back to casual conversation after he was told that Brennan’s would be in contact with him. While admitting that he never spoke with Brennan’s prior to the drafting of the contract about what he would, or would not agree to, Dickie stated that he would not have signed the proposed agreement had it obligated him to pay Brennan’s royalty fees, included terms which would have placed any kind of temporal or geographic restriction on the use of his family name |¾9⅛ connection with restaurant operations in New Orleans, or, contained provisions for stipulated damages and attorney’s fees.
*1117 As for the circumstances surrounding the confection of . the subsequent agreement, Mr. Rittenberg, who was Brennan’s local counsel between 1998 and 2004, avers in his affidavit that he was contacted in 1998 by a representative of Brennan’s regarding a restaurant that Dickie was opening, “Dickie Brennan’s Steakhouse.” As he appreciated it, Brennan’s was - concerned that the name of Dickie’s new restaurant might infringe upon, or dilute, its trade name and trademarks. Accordingly, Mr. Rittenberg arranged for a conference call between himself, Mr. Colbert, and representatives of Brennan’s in order to discuss possible responses. Brennan’s, according to Mr. Rittenberg, “mentioned that they-wanted a simple agreement and one that was not onerous since they knew that Dickie Brennan would not sign any onerous agreement.” Brennan’s, likewise, “was not interested in spending a lot of money .in litigation with Dickie Brennan and thought that the practical solution to maintaining and protecting its Trade Name or Trademark would be the execution of such a simple agreement.”
Although he admits that Brennan’s and Mr. Colbert “might have” - discussed the inclusion of breach provisions in the proposed agreement, Mr. Rittenberg stated that Mr. Colbert was not asked to include such terms because Dickie would not sign such an agreement. ■ Mr. Rittenberg also averred that Brennan’s, for the same reason, did not request that the proposed agreement be a license agreement or that it include a license fee, royalty provision, or any kind of term or temporal | anprovision. After it was prepared, Mr. Rittenberg then forwarded a copy of the proposed agreement to Brennan’s, and asked for its review and to forward it to Dickie, if it met Brennan’s approval. Brennan’s neither questioned the proposed agreement nor requested , that it be modified. Rather, Brennan’s forwarded the proposal to Dickie who signed it on November 16, 1998, after making his own modifications. Brennan’s, in turn, signed the agreement, as modified by Dickie, on November 18, 1998. Mr. Rittenberg also attached two copies of the 1998 Agreement — a copy of the proposed agreement as prepared by Mr. Colbert, and a copy as modified and signed by Brennan’s and Dickie — to his affidavit.
In the November 4, 2003 correspondence — which post-dates the 2002 district court judgment, yet pre-dates the first Fifth Circuit opinion — Mr. Rittenberg forwards to Mr. Colbert, and asks for his comments on, a copy of a draft notice to Dickie unilaterally terminating the 1998 Agreement in accordance with Article 2024.[19] This notice, however, was never sent to Dickie. Rather, on February 18, 2004, Mr. Colbert wrote to Mr. Rittenberg, advising him to not terminate the 1998 Agreement unilaterally. He instead counseled that the better course would be to first wait until after the Fifth Circuit addressed their appeal at which time they would write a letter to Dickie’s attorney asking Dickie to take corrective measures within a set time to prevent brand confusion. Should Dickie fail to comply, Brennan’s could then bring a motion for contempt on the grounds that Dickie was |slviolating the district court’s 2002 judgment. Brennan’s would argue at the subsequent hearing that “the only equitable relief left is to order the 1998 Agreement dissolved and permanently enjoin Dickie from using the term BRENNAN’S -as part *1118 of a mark” given that he had been given a reasonable time to comply with the terms of the 1998 Agreement, yet failed to do so.
Mr. Colbert introduced the remainder of his exhibits in order'to show that Brennan’s was a sophisticated business that had signed, and was thus familiar with, trademark usage agreements, knew the range of alternative terms and conditions that could possibly be included in such agreements, and'was familiar with trademark terms of art, such as “license,” “licensee,” “licensor,” “license marks,” “license fees,” and “royalty fees.”
In its .trial :court opposition, Brennan’s argued, among other things, that summary judgment should .be denied because there are genuine issues of material fact as to what type of agreement Brennan’s wanted Mr. Colbert to draft. Brennan’s supported this assertion by attaching extract^ ed portions from alleged discovery depositions given by Pip and Ted Brennan. None of the extracts is prefaced by a title page, so we do not know when, or the lawsuit in which, they were taken. Moreover, none of the extracts indicates whether Pip or Ted were speaking individually or in their corporate capacities as officers of Brennan’s. Nevertheless, Ted testified that he first became aware in the summer of 1998 that Dickie was going to open., a steakhouse in New Orleans’ French Quarter under the Brennan name. Given the Brennan family’s" history of trademark litigation, , he 13r,feared that “this was going to be World War III the way it wás done.”[20] Upon returning home, Ted called his brothers. The brothers later met with Mr. Rittenberg, who advised them to speak with Mr. Colbert.
According to Ted, Mr. Colbert advised them- of two potential options. First, Brennan’s could sue Dickie for trademark infringement. Ted, however, testified that they did not want to sue because of the cost and because they wanted to avoid another intra-family war.[21] These concerns led Brennan’s to accept Mr. Colbert’s second proposed course of conduct, which was, in Ted’s words, “to draw up a license” that would tell Dickie “what you can do, what you can’t do, and what happens if you break the contract.”
Ted, by way of example, referenced a license agreement, prepared by Mr. Rit-tenberg, between Brennan’s and a restaurateur 'in Memphis. ' While noting that Brennan’s received royalties pursuant to the Memphis agreement, Ted could testify to no other specifies of that agreement. Similarly, Ted could not recall Whether he and his brothers'discussed the inclusion of a royalty or quality control provision in the proposed agreement ’ with Dickie. Significantly, at no point in the deposition excerpts does Ted testify as to what provisions Brennan’s actually wanted Mr. Colbertto include in the proposed agreement with Dickie. Ted, additionally, testified that he did not see the proposed 1998 Agreement until after it was executed by Dickie and Pip. Indeed, he could not recall whether the document was |3Seven prepared before or after-the meeting at the Royal Orleans with Dickie and Ralph.
Pip, in the excerpted portions from his deposition testimony, appears to have remembered even less than Ted. On the one hand, he testified that'the driving force behind the 1998 Agreement was brand confusion in the marketplace stemming *1119 from Dickie’s- use of the Brennan name. On the other hand, Pip could-not recall any of the details from Brennan’s initial conversation with Mr. Rittenberg and Mr. Colbert, or whether Brennan’s wanted a “short brief agreement,” rather than a lengthy and expensive one with Dickie, Indeed, Pip could not recall any specific discussion as to what provisions Mr. Colbert should include in the proposed agreement. Similarly, Pip could not even recall seeing the proposed agreement as forwarded to him by Mr. Rittenberg, although he acknowledged that he signed it on behalf of Brennan’s in his corporate capacity. Lastly, Brennan’s opposition memorandum also included copies of Mr. Rittenberg’s November 3, 2003 letter to Brennan’s, as well ás Mr. Colbert’s February 18, 2004 response. '■*
IV
In this Part, we discuss the parties’ arguments. And in that regard we are interested in whether any.alleged error by Mr. Colbert is obvious or gross.
A
Brennan’s arguments, notably, have shifted over the years. In it's brief lodged in connection with docket number 2012-CA-0145, Brennan’s first argued | S4that it did hot need to present expert legal opinion testimony in order to- méet its burden of proof because Mr. Colbert’s negligence was obvious. It, alternatively, argued that it could meet its burden of proof by relying upon fact testimony from Mr. Mole, the attorney who filed its second unsuccessful district court suit, or opinion testimony from Kyle Schonekas, Mr. Colbert’s expert legal witness. Brennan’s next argued that summary judgment was improvidently granted with respect to its claim, that Mr. Colbert failed to appeal the district court jury instructions. It allegedly needs no expert on this point because the trial judge was fully equipped to comprehend both the law as regards- contractual termination and the fact of Mr. Colbert’s concomitant malpractice in failing to appeal the instructions. Significantly, Brennan’s did not argue that genuine issues of material fact should have served to preclude summary judgment.[22]
Brennan’s current memorandum, again, does not assail the trial judge’s conclusion that no genuine issues of material fact exist which would preclude summary judgment in Mr. Colbert’s favor. Similarly, Brennan’s does not argue that the trial judge erred when he dismissed its claims that Mr. Colbert deviated below the standard of care in: Í) failing to prepare a license agreement as opposed to a consent-to-use agreement when he drafted the 1998 Agreement; 2) failing to include in the 1998 Agreement royalty provisions, “a term,” and breach of contract provisions for the recovery of attorney’s fees, costs, and specified damages; 3) | ^impairing or diminishing the strength of its trademark claims by failing to include such terms; and, 4) failing to advise it of the potential res judicata effect of Mr. Colbert’s own failure to assert contract termination claims in the federal district and circuit courts. Because Brennan’s does not assign th,ese rulings as error, we need not address them. See Rule 2-12.4 B(4), Uniform Rules — Courts of Appeal.
Brennan’s instead writes that the “singular issue of this appeal” is whether the trial judge erred in concluding that it needed expert testimony regarding Mr. Colbert’s “failure to allege the Article 2024 *1120 Claim.” Brennan’s needs no expert, it, asserts, because Mr. Colbert’s malpractice was specific and obvious. In support, it points to the Fifth Circuit’s two Brennan’s opinions. See Brennan’s Inc., 376 F.3d at 367 n. 5; Brennan’s Inc., 150 Fed.Appx. 365.
Brennan’s, however, has yet to explain how Mr. Colbert should have alleged an Article 2024. claim, when the claim should have been alleged, or what allegations should have been made. Notably, it has failed to introduce into evidence, or even refer to, copies of its first district court claim or the related jury instructions. We can reasonably infer that some type of termination allegation was included by Mr. Colbert in Brennan’s federal claim because the jury interrogatories, as referenced both by the district judge and the Fifth Circuit, gave the jury the option, upon certain factual findings, of dissolving the contract. See Brennan’s Inc., 376 F.3d at 361. Given its opacity on the subject, we must assume that Brennan’s' is arguing that Mr. Colbert deviated below the standard of care by failing to: 1) pursue the type of litigation strategy employed by Mr. Mole in the | .^context of its second federal district court action; and, 2) challenge the jury instructions on appeal.
Mr. Colbert’s position has changed little since he moved for summary judgment. Simply put, he argues that the trial judge correctly held that Brennan’s cannot meet its burden of proving the applicable standard of care absent expert legal testimony. Even if it could possibly meet its burden of proof at trial by eliciting fact testimony from Mr. Mole, or opinion testimony from Mr. Schonekas, Brennan’s, Mr. Colbert notes, failed to introduce any evidence‘as to what Mr. Mole or Mr. Schonekas would testify to at trial. And he argues that even if Brennan’s needs no expert testimony, summary judgment was warranted because he established that there are no genuine issues of fact and that Brennan’s could not meet its burden of proving malpractice at trial.
B
We now address Brennan’s assignment of error in light of the controlling law and the evidence introduced in connection with Mr. Colbert’s motion. Here, Bren- ■ nan’s makes the conclusory argument that the trial judge should have denied judgment on its failure-to-assert claim because Article 2024’s provisions are so self-evident, and Mr. Colbert’s failure to raise the claim so obvious a deviation, that together they render unnecessary legal expert testimony. In support, it cites merely to the text of Article 2024, and notes that there “is no dispute that the 1998 Agreement could be unilaterally terminated.”
| i¡7While Article 2024’s provisions are indeed straightforward, they do not support Brennan’s insinuation that the pursuit of a litigation strategy modeled after the one attempted by Mr. Mole could have been undertaken simply and without risk. Mr. Mole, it will be recalled, attempted to allege an Article 2024 claim by first sending a sixty-day notice to Dickie stating that Brennan’s was electing to terminate the 1998 Agreement and ordering Dickie to cease all use of his family name in connection with his restaurants. Mr. Mole then filed suit in federal district court seeking: 1) a declaratory ruling that its notice to Dickie effectively dissolved the 1998 Agreement; and, 2) a judgment enjoining Dickie from using his family name in connection with his restaurants. We must, accordingly, examine Article 2024 within the greater context of the Civil Code’s articles concerning general and conventional obligations. See La. Civil Code art. 13 (“Laws on the same subject matter must be interpreted in reference to each other.”); La. Civil Code art. 1756, et seq., *1121 on obligations in general; and, La. Civil Code art;1906, et seg., on conventional obligations or contracts.
We begin by noting that the 1998 Agreement, a consent-to-use agreement, is a species of contract. See Brennan’s Inc., 376 F.3d at 366. “A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished.” La. Civil Code art.1906. In the 1998 Agreement, Brennan’s gave up its right to sue Dickie for trademark infringement in connection with his use of the marks “Dickie Brennan’s Palace Cafe” and “Dickie Brennan’s Steakhouse” provided he “arranged the words in certain ways, did not usé certain typefaces, and [ssrefrained from • using words ;.. that would suggest a connection to Brennan’s.” Brennan’s Inc., 376 F.3d at 366. Put differently, Dickie can use'his family name in conjunction with the two restaurants and be free from the specter of trademark litigation, provided his use of the marks comply with the restrictions set out in the agreement. The 1998 Agreement, accordingly, is bilateral, or synallagmatic, because Brennan’s and Dickie bound themselves reciprocally, “so that the obligation of each party is correlative to the obligation of the other.” La. Civil Code art. 1908.
The 1998 Agreement, thus, has “the effect of law” between Brennan’s and Dickie. La. Civil Code art. 1983. As such, it can “be dissolved only through the consent of the parties or on grounds provided by law.” La. Civil Code art. 1983. In this case, the agreement is “of unspecified duration.” . La. Civil Code art. 2024. Accordingly, it. can be “terminated at the will of either party by giving notice, reasonable in time and form, to the other party.” Id. When acting pursuant to this Article, however, “the parties must comply with the overriding duty of good faith,” and provide “[reasonable advance notice” in order to “avoid unwarranted injury to the interests of the other.” Comment (e) to La. Civil Code art. 2024; see also La. Civil Code art. 1759 (“Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation.”). “In order to comply with the requirement of good faith, a party exercising his right to terminate a contract at will should consider not only his own advantage, but also the hardship to which the | Mother party will be subjected because of the termination.” Comment (f) to Da. Civil Code art. 1770.[23]
 The failure to act in good faith when terminating á contract such as the 1998 Agreement can, accordingly, expose a party to a breach of contract claim. See, e.g., N-Y Associates, Inc., v. Board of Commissioners of Orleans Parish Levee District, 04-1598, 04-1986, pp. 3-4 (La.App. 4 Cir. 2/22/06), 926 So.2d 20, 2223. “The measure-of damages in a breach of contract action depends upon whether the breach was in good faith or bad faith.” 1100 South Jefferson Davis Parkway, LLC v. Williams, 14-1326, p. 7 (La.App. 4 Cir. 5/20/15), 165 So.3d 1211, 1217. “An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.” La. Civil Code art.1997.
Because of the risk of incurring damages in a subsequent suit for breach of contract, therefore, the better practice is *1122 to seek judicial- dissolution rather than unilateral termination. “The intervention of the court is the best means of establishing, with- certainty, that the complaining party has good reasons to demand dissolution.” Waseco Chemical & Supply Co. v. Bayou State Oil Corp., 371 So.2d 305, 308 (La.App. 2nd Cir.1979), quoting 7 Litvinoff, La. Civil Law Treatise, Book 2; The principle of judicial dissolution is, therefore, “a necessary consequence of the overriding principle of good faith which subjects the- parties to the duty of observing a degree of tolerance in the matter of contract per-, formance.” Waseco Chemical & Supply Co., 371 So.2d at 308. Judicial dissolution, accordingly, “affords an* opportunity for the exercise of the court’s sovereign prerogative of weighing all these circumstances with large discretion” because it allows “the court to determine whether .the rendering , of only partial performance by the obligor, plus the delay. attending a possible completion, or the.failure in performing an accessory obligation, .warrants dissolution.” Id.
A course of action .modeled on Mr. Mole’s course of conduct would be, contra Brennan’s assertion, awash with unnecessary risk. Taken on its own terms, therefore, an attorney’s failure, to allege an Article 2024 claim is not, as Brennan’s suggests, tantamount to obvious negligence, if any at all. Cf., e.g., Frisard v. State Farm Fire & Casualty Co., 06-2353, p. 8 (La.App. 1 Cir. 11/2/07), 979 So.2d 494, 498 (“the failure to appear and defend a client, when that client faces substantial ramifications, is an obvious act Of professional negligence for which no expert testimony is needed.”). Indeed, the pitfalls attendant to this course of action were recognized by Mr. Colbert in his February 18, 2004 correspondence to Mr. Rittenberg, Brennan’s local counsel:
As to the issue of extra-judicial dissolution, I think that it would be best not to send a notice purporting to terminate the 1998 Agreement unilaterally, at least at this time. Since the Defendants are under , a court order to specifically perform, Judge Lemmon is likely to believe that all future proceedings relating to the Agreement are supposed to be judicial in nature and may view any claim of extra-judicial termination as an attempt to circumvent her previous ruling. Moreover an argument can be made by the other side that extra-judicial dissolution is ineffective in face of the Court’s January 2003 » order.[24] Also, since Dickie is unlikely to comply with our request, we would be forced to seek judicial relief from the. Court .in any event.
141In connection' with this final issue, we are also concerned that ah unilateral termination of the 1998' Agreement by Brennan’s may prompt Dickie to preemptively strike and seek a ruling from the district court either that he has specifically performed and/or that Brennan’s' has improperly' terminated the 1998 Agreement. Such action by Dickie undoubtedly would include a request for attorney’s fees. However, if we take the path we suggest above, we garner evidence of rioncompliance, control how and when the issue of Dickie’s noncompliance is raised with the court, and safeguard Brennan’s from any potential claims by Dickie that the 1998 Agreement was wrongfully terminated. [25] That is, we will be able to focus the issue on what should be before the court— *1123 namely, that-Dickie has not eliminated the likelihood of confusion.
Clearly, any consideration of Mr. Colbert’s supposed failure to “allege the Article 2024 Claim” in district court in the same manner as Mr. Mole would necessitate an examination of his' litigation strategy and trial performance.
Although an “attorney is obligated to exercise at least that degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality,” he “is not required to exercise perfect judgment in every instance.” Ramp, 263 La. at 786, 269 So.2d at 244. While obligated to perform with all reasonable diligence, attorneys “cannot be faulted for not being perfect.” Drury v. Fawer, 527 So.2d 423, 425-426 (La.App. 4th Cir.1988). As we have' noted before, “legal representation , in the handling of litigation and a trial cannot be perfect. It is a series of challenges and problems'requiring judgment calls at every juncture along the way. In this kind of activity mistakes are inevitable and perfection is impossible.” Drury, 527 So.2d at 426. “Cases that involve the attorney’s, choice of trial tactics, strategy or reasonable discretion are complex questions of legal skill and experience, which require evaluation and analysis by Illegal experts in order to determine the standard of care and possible deviations therefrom.” Houillon, 530 So.2d at 684 (Plotkin, J., concurring).
 In a case such as this one, an expert would need to. consider, among other things, “the legal issues, the actual-and potential witnesses, the type of trial judge, the quality of the evidence and the ability of the adversary.” Houillon, 530 So.2d at 684 (Plotkin, J., concurring). The determination of facts and circumstances, as they relate to a trial lawyer’s litigation strategy, are not always “matters of common knowledge for laymen or judges,” Id. (emphasis added). Therefore, legal aptitude “in the choice of trial tactics and strategy can only be determined with guidance and assistance from individuals with similar types of professional trial experience.” Houillon, 530 So.2d at 685 (Plotkin, J., concurring). The trial judge in this case concluded correctly that -any negligence or error on the part of Mr. Colbert was not obvious or gross, and, on that account, legal expert testimony would be needed in order to determine ‘the applicable standard of care under the facts of this case should it proceed to trial. See Crescent City Property Redevelopment Association, LLC, 11-1292, p. 7, 89 So.3d at 1274.
We, likewise, find that the trial judge correctly dismissed with prejudice Brennan’s claim that Mr. Colbert deviated be-. low th¿ standard of care when he failed to challenge on appeal the district court’s jury instructions. .Ño party introduced.a copy of ,the instructions into evidence in connection with Mr. Colbert’s motion for summary judgment. And at, no point in these proceedings has Brennan’s quoted the actual, wording of the charges, specified how, they were | ^legally erroneous, or suggested how they should have been written. . Instead, . it relies. solely upon the Fifth Circuit’s footnote 5. See Brennan’s Inc., 376 F.3d at 367 n. 5. This footnote, however, is clearly dicta in which the court pointedly refused to comment on the propriety of the jury instructions. Brennan’s Inc., accordingly, provides no support for the claim that Mr. Colbert was negligent in failing to .appeal the jury instructions. Its allegation on this point, amounts to .pothing more than a conclusory, unsupported challenge to Mr. Colbert’s litigation strategy and appellate performance. Just ,as the trial judge correctly concluded that Brennan’s would need legal expert testimony to determine the applicable standard of care with respect to its failure to allege in the district court claim, we also find that he was correct in concluding that legal *1124 expertise would be needed by Brennan’s in order establish .the standard of care with respect to its failure to allege on appeal claim.
And our de novo review reveals no other evidentiary or legal support for Brennan’s claim that it can at trial meet its burden of proving the applicable standard of care. Brennan’s does not challenge the trial judge’s conclusion that no genuine issues of material fact exist. Similarly, it has failed to introduce into evidence, or even refer to, copies of its federal claim or the actual jury instructions. Indeed, Brennan’s has yet to explain how its claims as filed, or the jury interrogatories as read, in federal court are legally erroneous or deviate in any way below the applicable standard of care. And neither has it explained how any combination of alternate jury instruction or pled allegation would have produced a I ^result different from the one Mr. Colbert actually obtained. In its prior appeal, Brennan’s argued that it could meet its burden of proof through the factual testimony of Mr. Mole and the opinion testimony of Mr. Schonekas, Mr. Colbert’s expert. Alternatively, Brennan’s argued that no expert was néeded because the trial judge was qualified to ascertain the applicable standard of care. Brennan’s, however, has .introduced neither affidavit, report, nor deposition testimony from either Mr. Mole or Mr. Schonekas in opposition to Mr. Colbert’s motion for summary judgment. And the trial judge in this ease stated specifically on the record that he would need expert legal testimony to determine at trial the applicable standard of care. Cf. Schlesinger v. Herzog, 95-1127, 95-1128, p. 9 (La.App. 4 Cir. 4/3/96), 672 So.2d 701, 708 (“Where the trial court is familiar with the standards of practice in its community ... the assistance of expert testimony may be unnecessary.”). Accordingly, the substance of any fact or opinion testimony that Mr. Mole or Mr. Schonekas might give at some future trial is entirely hypothetical, speculative, and unsuited to create a genuine issue, of material fact. See Simon v. Hillensbeck, 12-0087, p. 6 (La.App. 4 Cir. 9/19/12), 100 So.3d 946, 950 (“In defending against a well-taken motion for summary judgment, the plaintiff may not rely upon the allegations, contained, in his pleadings, simply speculate, or otherwise posit the hypothetical existence of a genuine issue of material fact.”), Brennan’s unsubstantiated assertions regarding 'Messrs. Mole and Schonekas, therefore, neither rebut Mr. Colbert’s motion for summary judgment nor demonstrate that it might be able to meet its evidentiary burden at trial. Simply |4Sput, Brennan’s has pointed to nothing in the record to demonstrate that it'would be able to meet its Evidentiary burden at trial.
The record, accordingly, is devoid of any evidence as to what the applicable standard of care may actually be with respect to Brennan’s failure-to-assert claims. And we are certain that this is no simple case of professional negligence; the standard of care , that the attorney, Mr. Colbert, owed to his client, Brennan’s, under these circumstances is not “obvious” to us. And, as a consequence, we cannot find that Mr. Colbert’s actions deviated below any applicable standard. The trial judge correctly concluded that Mr. Colbert established a lack of factual support for an essential element of the attorney malpractice cause of action that Brennan’s was charged with proving at trial. Brennan’s, moreover, has failed to demonstrate that it will, in any fashion, be able to meet its burden of proof at trial. And after conducting a de novo review of the evidence in light of the applicable law, we conclude that the trial judge correctly granted Mr. Colbert’s motion for summary judgment.
Y
Up to this point, we have focused our attention on the summary judgment rendered on March 29, 2011,' which was *1125 designated final and appealable on June 14, 2011. In this final Part, for the sake of clarity and completeness,, we address an outstanding issue concerning the partial summary judgmént rendered on May 14, 2008. That judgment resulted from an earlier motion for summary judgment filed l4f;by Mr. Colbert which sought dismissal of all the malpractice claims on the ground that they were perempted.
As we earlier explained, see Part II-C-1, ante, the trial judge determined that some claims were not perempted because the alleged' malpractice occurred before Mr. Colbert’s pro hac vice admission, but, to the extent claims arose after his admission, the trial judge ruled that they were perempted. Thus, the motion for summary judgment was denied in part and granted in part.[26]
With respect to the claims which' the trial judge found were not perempted and as to which the motion for summary judgment was -denied, the resulting judgment was an interlocutory judgment which could not be appealed, see La. C.C.P. art. 2083 C,[27] and also was ineligible for designation as appealable because it was not a final judgment. See La. C.C.P. arts. 968, 1915; Wellman v. Tufail, 12-1173, p. 10 (La.App. 4 Cir. 2/6/14), 136 So.3d 51, 56 n. 4 (“The denial of a motion for summary judgment is. an interlocutory judgment that is not appealable and may not be designated as final by the trial court.”). And thus any claim that had not been previously adjudicated as perempted was clearly the subject of the later motion for summary judgment which resulted in the summary judgment which we affirm today.
147The more problematic issue, and one for which we sought clarification from Brennan’s by directing it to supplement its jurisdictional statement, is whether any claim which was dismissed as perempted under the May 14, 2008 partial summary judgment is disposed of by this appeal. While final because it determined the merits in part, the partial summary judgment was not appealable under any of the provisions of La. C.C.P. art. 1915 A(l).[28] Thus, *1126 in order for this 2008 partial | ^summary judgment to be immediately appealable, it required designation by the trial judge such as provided by La. C.C.P. art. 1915 B(l) (“designated ás a final judgmént by the court after an express determination that there is no just reason for delay”). Without the required designation, “[n]o appeal may be taken from a partial final judgment under Article 1915(B).” La. C.C.P. art. 1911 B.
At no time after its rendition did the 2008 partial summary judgment receive the required designation. It is unquestioned that this 2008 partial summary judgment on peremption was not among the other partial summary judgments that were enumerated and identified in the “Final Judgment,” which designáted as final and appealable the 2011 summary judgment. And it is only by this designation that we exercise our jurisdiction, as conferred by La. C.C.P. arts. 1911 B and 1915 B(l), to determine the correctness of that judgment.
Despite the recitation in the Final Judgment that the trial judge had “ruled on all matters in this case,” the Final Judgment itself contains no, decretal language. See Tsegaye v. City of New Orleans, 15-0676, p. 3 (La.App. 4 Cir. 12/18/15), 183 So.3d 705, 710.[29] Specifically, the Final- Judgment did not dismiss with prejudice all of Brennan’s claims against Mr. Colbert and his law firm. See Tsegaye, 15-0676, p. 9, 183 So.3d at 713. And, because the Final Judgment lacked decretal language, it is not a judgment which determined the merits “in whole,” see La. I43C.C.P. art. 1841, the consequence of which would have required Brennan’s to appeal the 2008 partial summary judgment or forego appellate review of the correctness of the judgment. See Favrot v. Favrot, 10-0986, p. 2 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, 1102 n. 1, quoting Roger A. Stetter, Louisiana Civil Appellate Procedure, § 3:32 (2010-2011 ed.) (“When an unrestricted appeal is taken from a final judgment, the. appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment.”).
Accordingly, despite the recitation of the Final Judgment and despite our own misgivings about prolonging this litigation, we conclude that we cannot exercise our appellate jurisdiction over the 2008 partial summary judgment at this time because the trial court retained jurisdiction to adjudicate this remaining issue. See La. C.C.P. art. 1915 C. Consequently, we cannot now.amend the Final Judgment so that it provides for the dismissal with prejudice *1127 of all Brennan’s malpractice claims or, conversely, reverse the 2008 partial summary judgment.
Thus, thé 2008 partial summary judgment, decided adversely to Brennan’s, remains pending in the trial court; Until either it is designated as final for the purposes of appeal under Article 1915 B(l) or the trial judge renders an effective final judgment which decrees the adjudication of all remaining claims and rights and liabilities of all the parties, it remains subject to revision in the trial court. See La. C.C.P. art. 1915 B(2) (“not constitute a final judgment for the purpose of an immediate appeal and may be revised at any time prior to rendition of judgment | ^adjudicating all the claims and all the rights and liabilities of all the parties”) (émphasis added).
Therefore, as part of our decree, we are remanding the sole remaining issue of the 2008 partial summary judgment .to the trial court. Upon remand, Brennan’s may seek designation of the judgment as final and appealable under Article 1915 B(l) by which, if granted, it may then invoke appellate review of the judgment. See MR Pittman Grp., LLC v. Plaquemines Par. Gov’t, 15-0395, p. 6 (La.App. 4 Cir. 9/16/15), 176 So.3d 549, 553, quoting Fraternal Order of Police v. City of New Orleans, 02-1801, p. 4 (La.11/8/02), 831 So.2d 897, 900 (“A party may opt to seek a designation of finality ‘from the. trial judge to appeal the partial judgment at any time prior to entry of a final judgment in the case.’ ”) (emphasis added in MR Pittman Grp., LLC). Or, upon remand, Mr. Colbert and his law firm may file a motion to dismiss with prejudice Brennan’s lawsuit whereby,.if granted, the delays for Brennan’s demanding appellate review would commence. See La. C.C.P. arts. 1673, 2087 A.
DECREE
We ' affirm the summary ' judgment granted on March 29, 2011. We remand the case to the trial court for further proceedings with respect to the sole remaining issue of the 2008 partial summary judgment. All costs to date are taxed to Brennan’s Inc. See La. C.C.Pi art. 2164.
AFFIRMED AND REMANDED

. Because of the numerous references to Brennan’s Inc., as well as individual Brennan family members, throughout our opinion, we *1104 elect to refer to Brennan’s Inc. as "Brennan’s,” and to the individual family .members by their first names.

. Brennan’s also joined its local- counsel, but this appeal does not involve- them. When referring to Mr. Colbert throughout our opinion, we also refer to his law firm of Kenyon & Kenyon.

. The 1998 agreement identifies the following service marks and trademarks as belonging to Brennan’s: 1) the name '‘Brennan's;’’ 2) the *1106 phrase “Breakfast at Brennan’s;” 3) "a fanciful rooster design;” and, 4) the name "Owen Brennan’s,”

. At the time suit was filed, Seven Sixteen Iberville was the company that owned and operated the steakhouse, while Cousins Restaurants' owned and operated Dickie Brennan's Palace Café.

. We observe, however, that neither of these rulings have been introduced into evidence or made a part of the record before us.

. On the other hand, the jury determined that Dickie did not breach the 1998 Agreement in connection with Dickie Brennan’s Palace Café.

. Brennan’s also argued that the .district judge erred in barring it from presenting evidence of the value of a reasonable royalty figure in the damages phase of the trial. Brennan's further argued that it was entitled to judgment as a matter of law, or at least a new trial, on their claim, that Dickie fraudulently induced them to sign the 1998 Agreement. . Dickie cross-appealed the damage award, asserting that the district judge erred in fáiling to exclude Brennan’s expert testimony on damages and that, without such testimony, the damage award should be vacated. The Fifth Circuit, however, found no error in the district judge's rulings. None of these rulings, or the Fifth Circuit’s subsequent áffír-mations, are at issue in* the matter before us.

. Article 2024 provides that, "[a] contract of unspecified duration may be terminated at the will of,either party by giving notice, reasonable in time and form, to the other party.”

. Mr. Colbert’s open' account claim also sought to hold Pip, Jimmy, and Ted personally liable for Brennan’s corporate debts.. In response to individual motions for summary judgment filed by the Brennan brothers, the trial judge on March 28, 2011, dismissed this portion of Mr. Colbert’s reconventional demand. Mr. Colbert also, sought a motion for summary judgment on his open account claim against Brennan’s, which the trial judge granted on March 31, 2011.

. La. R.S. 9:5605 provides:
A. No.action for damages against any.attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide legal services shall be brought unless filed in a court of compe-tent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that thé alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section are remedial and apply to all causes of action without regard to the date when the alleged act, omission, or neglect occurred. However, with respect to' any alleged act, omission, or neglect occurring prior to September 7, 1990, actions must, in all events, be filed in a court of competent jurisdiction and proper venue on or before September 7, 1993, without regard to the date of discovery of the alleged act, omission, or neglect. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive 'periods within *1111 the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.
C.Notwithstanding any other law to the contrary, in all actions brought in this state against any attorney'at law duly admitted to practice in this state, any partnership. of such attorneys at law, or any professional law corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, the prescriptive and peremptive period shall be governed exclusively by this Section.
D. The provisions of this Section shall apply, to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
E., The peremptive period provided in Subsection A of this Section shall not apply in cases of fraud, as defined in Civil Code Article 1953.

. Brennan’s, in response, filed a motion for new trial, which the trial judge denied by way of judgment signed on June 14, 2011. It has not, however, appealed this judgment or the denial of its motion for new trial. We note, however, that a "motion'for new trial pursuant to La. C.C.P. art. 1974 applies only to final judgments.” Magallanes v. Norfolk S. Ry. Co., 09-0605, p. 3 (La.App. 4 Cir. 10/14/09), 23 So.3d 985, 988, citing Carter v. Rhea, 01-0234, p. 4 (La.App. 4 Cir. 4/25/01), 785 So.2d 1022, 1025.

. Mr. Colbert appealed the dismissal of his personal liability claims against the Brennan brothers. We, however, affirmed the judgment. See Brennan’s Inc. v. Edward Tuck Colbert, 11-1095 (La.App. 4 Cir. 2/29/12), 85 So.3d 787.

. The March 31, 2011 judgment fixed the amount of Mr. Colbert’s attorney's fees at $2,124,199.72. It also cast Brennan’s in judgment for this amount, as well as for those reasonable attorneys’ fees expended by Mr. Colbert in the prosecution of his open account claim. See La. R.S. 9:2781.' Brennan’s has not sought appellate review of this judgment, which is now final and executory. See Larkins v. David Wilkerson Const., 08-0576, p. 6 (La.App. 4 Cir. 12/17/08), 3 So.3d at 67, 70.

. Although the order granting Brennan’s a devolutive appeal is not attached to a corresponding motion, Mr. Colbert acknowledges that he prepared the November 18, 2011 order "so that the issues presented by the ineligibility of Brennan’s Inc.’s attorney could be presented to this Court and, if appropriate, the strength of Brennan's Inc. [sic ] appellate arguments could be tested.”

. As noted, Brennan's has never appealed the judgment which granted Mr. Colbert’s open account reconventional demand.

. Mr. Colbert, however, has moved to dismiss Brennan's appeal "for lack of appellate jurisdiction and irregularities, errors, or defects.” Having studied the record, the arguments of the parties, and the applicable law and jurisprudence, we deny Mr. Colbert’s motion to dismiss.

. We refer, of course, to the version of Article 966 in effect at the time Brennan’s filed its present lawsuit.

. TJO, Inc., was a corporation comprised of Theodore "Ted,” James "Jimmy,” and Owen “Pip” Brennan,

. Like the notice actually sent to Dickie by Mr. Mole, the notice prepared by Mr. Ritten-berg unilaterally terminates the 1998 Agreement on the grounds that Dickie’s failure to take effective measures to eliminate confusion between the two sets of restaurants violates the district court’s 2002 judgment compelling his performance.

. In using the phrase "World War lili” Ted explained that he was referring to costly, contentious trademark litigation between Ted, his brothers, his aunts, and uncles, and their respective business entities that was resolved by the “so-called ’79 agreement.”

. Ted stated that Mr. Colbert advised Brennan’s that litigation would cost anywhere between $300,000 to $600,000.

. While noting in passing that Mr. Colbert’s factual claim that Brennan’s asked Mr. Colbert to prepare a “simple” agreement'is “hotly contested,” it pointed to no evidence in the record which would convert this quarrel from á mere hot contestation to a genuine issue of material fact.

. The second paragraph of Article 1770 provides that a “resolutory condition that depends solely on the will of the obligor must be fulfilled in good faith." While this article encompasses explicit termination-at-will clauses, we perceive little, if any, difference between a contract which contains such a clause and one of unspecified duration. In either case, the agreement may be terminated at will, which action is subject to an overriding duty of good faith.

. The record does not disclose the substance of the federal district judge's January 2003 order.

. See Part IV, ante, for a summary of Mr. Colbert’s proposed course of action.

. In Davis v. Cheema, on appeal of a summary judgment we similarly "split” the judgment by amending the decretal language of the trial court's judgment, deleting the dismissal with prejudice of one of the plaintiff’s two theories of recovery, and then remanded the matter for trial on the remaining theory. 14-1316, pp. 20-21 (La.App. 4 Cir. 5/22/15), 171 So.3d 984, 994.

. "An interlocutory judgment is appealable only when expressly provided by law.” La. C.C.P. art. 2083 C.

. . See La. C.C.P. art. 1841. Article 1915 provides:
A. A final judgment may be rendered and signed by the court, even though it may not grant the successful patty or parties all of the relief prayed for, or may not adjudicate all'of the issues in the case, when the court:
(1)Dismisses the suit as to less than all of the parties, defendants, third party plaintiffs, third party, defendants, or intervenors.
(2) Grants a motion for judgment on the pleadings, as provided by Articles 965, 968, and 969,
(3) Grants a motion for summary judgment, as provided by Articles 966 through 969, but not including a summary judgment granted pursuant to Article 966(E).
(4) Signs a judgment on either the principal or incidental demand, when the two have been tried separately, as provided by Article 1038.
(5) Signs a judgment on the issue of liability when that issue has been tried separately by the court, or when, in a jury trial, the issue of liability has been tried before a jury and the issue of damages is to be tried before a different jury.
(6) Imposes sanctions or disciplinary action pursuant to Article 191, 863, or 864 or ■■Code of Evidence Article 510(G).
B. (1) When a court renders a partial judgment or partial summary judgment or sustains an exception in part, as to one or more but less than all of the claims, demands, issues, or theories against a party, whether in an original demand, reconven- *1126 tional demand, cross-claim, third-party claim, or intervention, the judgment shall not constitute a final judgment unless it is designated as a, final judgment by the court after an express determination that there is no just reason for delay.
(2) In the absence of such a determination and designation, any such order or decision shall not constitute a final judgment for the purpose of- an immediate appeal and may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.
C. -If an appeal is taken from any judgment rendered under the provisions of this Article, the trial court shall retain jurisdiction to adjudicate the remaining issues in the case.

. "For a judgment to be ‘a valid final judgment,' it must contain ‘decretal language,’ ... The absence of necessary decretal language means that the judgment is not final and appealable_ Importantly, for the language of a judgment to be considered ‘decre-tal,’ it ‘must name the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or denied.' ... And we must be able to determine from the judgment itself-without any reference to an extrinsic source-the specific relief granted.” Tsegaye, 15-0676, p. 3, 183 So,3d at 710 (citations omitted).